TRASK v. MAGUIRE.

A railroad company exempted by the legislature of a State from taxation accepted bonds for large sums of money from the State by way of loan, the statute which authorized the transaction declaring that the acceptance by the company of the bonds should operate as "a mortgage of the *road* of the company and every part and section thereof, and its *appurtenances;*" and that if the company did not provide for the payment of the bonds it should be lawful for the governor to sell "their road and its *appurtenances*" at auction to the highest bidder, or to buy in the same . . . subject to such disposition, in respect to *such road* or its proceeds, as the legislature might thereafter direct.

Subsequently to this the State made for itself a new constitution, provisions of which were in these words:

"No property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools and such as may belong to the United States, to this State, to counties, or to municipal corporations within this State.

"The General Assembly shall not pass special laws . . . exempting any property of any named person or corporation from taxation."

At the same time it adopted in a separate form "An ordinance for the payment of State and railroad indebtedness;" which was to "have full force and effect as a part of the constitution," which ordinance, after

referring to the particular railroad company now under consideration and then in default, and to some other railroad companies, ordained that "the General Assembly shall provide by law for the sale of the railroad and other property, and the *franchises* of the company that shall be in default under the lien reserved to the State." And ordained further that "whenever the State shall become the purchaser of any railroad or other property, or the *franchises sold as hereinbefore provided for*, the General Assembly *shall provide by law in what manner the same shall be sold.*" It added that no sale should be made "without reserving a lien upon all the property and franchises thus sold."

Subsequently to this the governor took the opinion of the judges of the Supreme Court of his State (as its constitution authorized him to do) upon the meaning of parts of this ordinance, but not specially upon the relations of any of them to the provision already quoted of the constitution; and the judges returned for answer, among other things, that no sale could be made by the State without reserving a lien, but that "the legislature was left unrestricted further as to the time, *terms, and conditions* of sale." ·

The legislature after this passed a law to foreclose the State lien; the law enacting that if the State should buy the road in and afterwards sell it the persons purchasing should have all the rights, franchises, privileges, and immunities which were enjoyed by the companies for whose default the road was sold. The road was sold, the State purchased it in, and afterwards sold it to certain persons, the vendees of whom organized themselves, as the laws of the State allowed them to do, into a new corporation A collector of State and county taxes having sought to enforce the payment of State and county taxes from this new corporation, which preserved the name of the old one, a stockholder in the new one filed a bill to enjoin him. *Held—*

1st. That when the State became the purchaser of the railroad and its appurtenances, and held them, the immunity from taxation previously granted ceased of necessity, the property belonging now to the State.

2d. That the ordinance did not mean to say that the legislature might provide for the sale in any manner which the new constitution forbade.

3d. That the new constitution forbade the renewal of an exemption from taxation as much as it did the creation of one in an original form.

APPEAL from the Circuit Court for the District of Missouri; in which court Trask filed a bill against Maguire, collector of State and county taxes at St. Louis, to restrain him from collecting taxes upon the property of the St. Louis and Iron Mountain Railroad Company, a corporation organized in the State of Missouri, July 26th, 1867, and to have the property of the said company decreed exempt from liability to such taxes.

The case was this:

A general corporation law of Missouri, in force in 1845, thus ordained :*

"The charter of every corporation that shall hereafter be granted by the legislature shall be subject to alteration, suspension, and repeal, at the discretion of the legislature."

This provision of general law being in force, the legislature of Missouri, on the 3d of March, 1851, passed "An act to incorporate the St. Louis and Iron Mountain Railroad Company." The capital stock of the company was $6,000,000, and it was enacted that—

"The *stock of said company* shall be exempt from all State and county taxes."

On the 17th of February, 1853, it was enacted that the railroad abovementioned as having been incorporated should be exempted from the provisions of the general corporation law already quoted. The statute further enacted :

"All the engines, cars, wagons, machines and other property belonging to said company, shall be deemed a part of the capital stock of the company, and shall be vested in the respective *shareholders* of the company forever, *according to their respective shares*, and transferable by them in the transfer of stock, as personal property."

Subsequently to this, and to aid it in making the road, the State of Missouri lent to the company (in the shape of bonds, the principal and interest of which the company agreed to pay) a large sum of money. The act authorizing the transaction enacted that none of the bonds should be delivered to the company until it filed in the office of the secretary of state certificates of acceptance of them, executed under the corporate seal, &c. The act then proceeded:

"SECTION 4. Each certificate of acceptance so executed and filed as aforesaid, shall be recorded in the said office of the secretary of state, and shall thereupon become and be, to all intents

---

* Revised Statutes of Missouri, 1845, p. 232.

and purposes, *a mortgage of the road of the company* executing and filing their acceptance, as aforesaid, *and every part and section thereof, and its appurtenances,* to the people of this State, for securing the payment of the principal and interest of the sums of money for which such bonds shall from time to time be issued and accepted.

"SECTION 11. In case the said companies, or either of them, shall make default in the payment of either interest or principal of the said bonds . . . it shall be lawful for the governor to sell their *road and its appurtenances,* by auction to the highest bidder, or to buy in the same at such sale for the use and benefit of the State, subject to such disposition in respect to such *road* or its proceeds as the legislature may thereafter direct."

On the 4th of July, 1865, the State of Missouri adopted a new constitution of government. It contained the following provisions:

"No property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools, and such as may belong to the United States, to this State, to counties, or to municipal corporations within the State.

"The General Assembly shall not pass any special laws . . . exempting the property of any named person or corporation from taxation."

At the same time that it adopted this new constitution it adopted, in the separate form of AN ORDINANCE, entitled "An ordinance for the payment of State and railroad indebtedness," certain provisions which were to have "full force and effect as a part of the constitution of the State."

The ordinance was thus:

"SECTION 1. There shall be levied and collected from the Pacific Railroad, the North Missouri Railroad Company, and the *St. Louis and Iron Mountain Railroad Company,* an annual tax of 10 per centum of all their gross receipts for the transportation of freight and passengers . . . from the 1st of October, 1866, to the 1st of October, 1868, and 15 per centum thereafter; which tax shall be appropriated by the General Assembly to the payment of the principal and interest now due, or hereafter to become due, upon the bonds of the State, and the bonds guaranteed by the State, issued to the aforesaid railroad companies.

"SECTION 3. The tax in this ordinance specified shall be collected from each company hereinbefore named only for the payment of the principal and interest on the bonds, for the payment of which such company shall be liable; and whenever such bonds and interest shall have been fully paid, no further tax shall be collected from such company.

"SECTION 4. Should either of said companies refuse or neglect to pay said tax as herein required, and the interest or principal of any of said bonds, or any part thereof, remain due and unpaid, *the General Assembly shall provide by law* for the sale of the railroad and other property, *and the franchises of the company* that shall be thus in default, *under the lien reserved to the State,* and shall appropriate the proceeds of such sale to the payment of the amount remaining due and unpaid from said company.

"SECTION 5. Whenever the State shall become the purchaser of any railroad or other property, *or the franchises* sold as hereinbefore provided for, *the General Assembly shall provide by law in what manner the same shall be sold,* for the payment of the indebtedness of the railroad company in default; but no railroad or other property, or *franchises* purchased by the State, shall be restored to any such company until it shall have first paid . . . all interest due from said company; and no sale or other disposition of any such railroad or other property, *or their franchises,* shall be made without reserving a lien upon all the property and franchises thus sold or disposed of, for all sums remaining unpaid; and all payments therefor shall be made in money or in bonds or other obligations of this State."

On the 1st of November, 1865—soon after the adoption of the new constitution and of this ordinance—the General Assembly met, and bills were introduced providing for the sale of several railroads, including the St. Louis and Iron Mountain, then in default on its obligations. Pending these bills, questions as to the effect of the ordinance arose in the mind of the governor, and on the 27th of the same month of November he propounded to the judges of the Supreme Court, as it was his right to do under the constitution of Missouri, certain interrogatories as to the operation of the ordinance, and among the rest one as follows:

"If you are of opinion that the sale of the railroads may be

ordered before such refusal or neglect, I request you to say whether such sale can be made ' without reserving a lien upon all the property and franchises thus sold for all sums remaining unpaid,' as provided by section five of the ordinance. In other words: Does this clause in the ordinance constitute a condition of *all* sales of railroads ordered by the State, or does it refer only to sales made, under the ordinance, for refusal or neglect to pay the tax?"*

To these questions the judges replied. In the course of their reply they say that one of the things provided for by the ordinance is a tax to pay the debts of the railroad companies to the State, and another thing provided for is, " in what manner railroads purchased by the State under her lien shall be sold again;" that " the fifth section relates to all sales of railroads under liens reserved to the State," whether sold for the non-payment of the tax or for the non-payment of the mortgage-debt. " The fifth section," say the judges, " provides further that no sale or other disposition of any such railroad or other property, *or their franchises*, shall be made by the State without reserving a lien upon the property sold for all sums remaining unpaid—that is to say by the purchaser, and the purchaser is required to make all payments therefor in money, or in bonds, or other obligations of this State; but the legislature is left *unrestricted* further as to the time, *terms, and conditions* of sale."

After this, that is to say, on the 16th of February, 1866, the legislature passed an act " to foreclose the State lien and to secure the early completion of the road."

By the act it was made the duty of the governor to advertise for sale the different roads in default, " their appurtenances, rolling stock, and property of every description, *and all rights and franchises.*" A board of commissioners was to attend the sale, and on a contingency named purchase for the State. The commissioners, in case the State should purchase, were to give notice of their authority to sell, and to invite proposals to purchase. The governor, on a sale

---

* Advisory Constitutional Opinions, 37 Missouri, 129.

being made by the commissioners, was to make a deed to the purchaser, which, it was provided, should have "the effect to convey, transfer, and make over to the purchaser said road and *all of the franchises*, privileges and rights, title and interests appertaining to the road." And the act further provided, that the purchaser should acquire by his purchase "all the rights, franchises, privileges, and *immunities* which were had and enjoyed by" the original corporation "under the charter and the laws amendatory thereof."

One month after the passage of the act just quoted, and pending proceedings thereunder for the sale of the road, another act was passed, approved March 20th, 1866, entitled, "An act authorizing the incorporation of the purchaser or purchasers of any railroad, or of any part, section, or branch thereof, which has heretofore or may hereafter become forfeited to and sold by the State." That act enacted thus:

"SECTION 4. Each corporation provided under this act shall have the same power, franchises, rights, and privileges, and be subject to the same liabilities and restrictions as the corporation to which it shall become the successor may have had by its original charter, and the amendments thereto, into and over the property and franchises forfeited and sold as aforesaid."

At the sale, which the governor advertised, the State bought the railroad and its appurtenances in : and the commissioners sold it to three persons, who afterwards sold it to one Allen. Allen, availing himself of the privileges of the last above-quoted act, organized himself and certain other persons, including Trask, already named as the complainant below, into a new corporation having the name of the old one.

Hereupon the defendant, Maguire, a collector, as already said, of State and county taxes in Missouri, having sought to levy certain State and county taxes on this new corporation, Trask filed a bill in the court below to enjoin him, and that court dismissed the bill. Trask now appealed from that decree.

*Messrs. B. R. Curtis and Drydens, for the appellant:*

That the property of the original corporation was exempt from taxation is undeniable. It is nearly or quite as clear that if the purchaser at the sale which was made had been a private person, or a corporation—any purchaser other than the State—such purchaser would have held what he bought, equally exempt   The lien of the mortgage was " on the road of the company, and every part and section thereof, and its appurtenances." That by the word appurtenances it was meant at the time that all rights, franchises, privileges, and immunities should pass under the lien is hardly questionable. In any but a purely technical sense—the sense in which the word is used in a deed—appurtenances would certainly include them. They would certainly do so alike in the popular and in the legislative sense, and these are the only important senses to be considered here; for the transaction was between managers of a railroad and a body of legislators. The State expected to get and the road meant to give as a security all that it had. Why retain an immunity from taxation when " the road and every part and section thereof, and its appurtenances," were put in mortgage and liable to be gone ?   Of what use would the immunity be when there was no property to which it could apply ? Further than this, there would be ground to argue that in a stricter sense the word appurtenances would include the immunity.*

The only difficulty in the case is that the *State* has purchased; that becoming owner of the road, she held it, of necessity and independently of any contract with the mortgagors, free from liability to taxation. And then, the further difficulty, that before she sold, the provisions of the new constitution intervened, and prevented her granting, as she undeniably meant to do, free from her own ability to tax.

The difficulty vanishes in the face of the " ordinance," which has " the same force and effect" as the constitution.

---

* Pickering *v.* Steples, 5 Sergeant and Rawle, 107 ; Bouvier's Law Dictionary, title " Appurtenances."

1. The constitution and the ordinance being parts and parcels of one law ought not to be construed separately, but in the construction of the one the other ought to be taken into consideration.

Inasmuch as the ordinance, by its plain words, intended to pass to the purchaser all the franchises of the railroad companies named in it; and as one of the franchises of at least one of the companies was exemption of its property from taxation, the ordinance was of necessity an exception, and intended to be an exception to the general rule established by the constitution, subjecting all property to taxation. There is room for both parts of the law to operate; the rule and the exception each in its place. And the law should be so construed as that both may stand and have effect.

2. The rule and the exception are not inharmonious in their general objects. The primary object of the rule is *revenue.* If revenue was not the primary object of the exception it was at least a prominent one, as a recurrence to the situation of the State and the history of the times will show. At the time of the adoption of this constitution and ordinance, it is matter of common knowledge that the State was staggering under the burden of an enormous debt, with resources wasted by a devastating war. In such an exigency what measure would so likely add to the wealth of the people and to the resources of the State as the extension of her railroads, then but just begun, into the mineral and agricultural regions of the State, lying as yet undeveloped? It was in this view, and in a large degree as a measure of finance, that the convention resolved upon the project of selling these roads and extending them to their ultimate destinations. But in order to the success of the project, privileges and franchises had to be offered to induce the embarkation of capital apparently, but not really, at the expense of the public revenue.

3. Upon a fair construction of the ordinance, power was given to the legislature to grant to the purchasers of the property of the defaulting corporations the exemption insisted upon by the complainant. The fourth section of the

ordinance relates to a period of time prior to the foreclosure, while yet the title to the property remains with the mortgagor, and contemplates a then future sale in foreclosure at which the State might become the purchaser. The fifth section looks to a period after foreclosure and presupposes the purchase of the mortgaged property by the State at the foreclosure sale. Both sections direct that provision be made by law for sales. What is it that the fourth section requires to be sold? "The railroad and other property, and *the franchises.*" Not one franchise, merely, but the plural; franchises, *all* of the franchises of the company. What by the fifth section is to be sold? The answer is, the *same railroad*, the *same other property*, the *same franchises* "as hereinbefore provided for" in the fourth section. All, without exception or diminution, that the State acquired at the sale under the fourth section was to be sold by it to its own vendee under the fifth section; the vendee of the State was to take every right that the State acquired at the sale for foreclosure. The State acquired at the foreclosure sale every right that the mortgagor had. If the mortgagor had the right to hold its property exempt from taxation, that right, by the provisions of the ordinance, would pass by the sale under the mortgage to the State and then from the State to its vendee. If it be objected that the franchises of the St. Louis and Iron Mountain Railroad Company did not, for want of apt words, pass by the mortgage, and that therefore the franchises of the company did not pass to the State at the foreclosure sale; we reply: first, as we have already once said, that the words of the mortgage were and are sufficient in law to pass the franchises of the mortgagor. But, second, this ordinance was the work of the people acting as lawmaker in their sovereign capacity. The sovereign possesses within himself all fulness of franchises. He is the author and source of all franchises. The sovereign people professed in this ordinance to possess and to be able to impart the franchises of these defaulting companies. Their lawfully appointed agents sold, and for them professed to convey these franchises, and having done this they will not be per-

mitted now to stultify themselves by the plea that they did not possess the things which they professed to grant. But if they did not then possess them specifically they must be held to supply the lack from their original inexhaustible stores.

It was the clear intention of the convention to give to the purchaser all that was enjoyed by the companies in default, and it was just as clearly within the competency of the convention to give what it thus intended to give, whether the franchises previously given out had come back to the State or not. And as all parties, vendor and vendee, here contracted upon the idea that the one was giving and the other receiving the franchises claimed, it is no hardship to hold nor is it any stretch of judicial authority to decide that, in law the convention gave what it then intended to give, and had the power to give.

*Mr. R. E. Rombauer, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The question presented for our determination in this case is, whether the property of the present St. Louis and Iron Mountain Railroad Company, a corporation created under the laws of Missouri, is, by an irrepealable legislative grant, forever exempted from all State and county taxes. Two corporations bearing that name have existed in Missouri, the second succeeding the first in the possession and ownership of its road and property. The first was created by an act of the legislature of the State, passed in March, 1851; the second was formed in July, 1867, under an act of the previous year authorizing the incorporation of the purchaser or purchasers of any railroad, or any part, section, or branch thereof, which had previously been, or might thereafter be, forfeited to or sold by the State.

The property of the first corporation was undoubtedly exempt from State and county taxes. The act of incorporation adopted as part of it a provision of another act, which declared in terms that the stock of the company should be thus

exempt.* It is true that at this time a statute was in existence, passed in 1845, which declared that the charter of every corporation subsequently granted should be subject to alteration, suspension, and repeal at the discretion of the legislature. But from the operation of this provision the company was expressly exempted by an act amendatory of its charter, passed in 1853.† From that time at least the exemption of its stock from State and county taxation was placed beyond legislative interference. The amendatory act also declared that all the engines, cars, wagons, machines, and other property belonging to the company should be deemed a part of its capital stock, and be vested in its respective shareholders, according to their respective shares. All the property of the company was thus placed within the exemption which attached to the original stock; that designated was to be deemed a part of such stock, as well as that originally embraced by this term.

On the argument some attempt was made, from the use of the term *stock* in the original act, and the language of the amendatory act, that the property should be vested in the respective shareholders according to their respective shares, to establish the position that the exemption extended only to the separate shares of the individual stockholders. But the argument does not strike us as possessing much force. The terms "stock of the company," imported the capital stock of such company, the subscribed fund which the company held, as distinguished from the separate interests of the individual stockholders. The language of the amendatory act did not qualify this meaning; that only declared that other property of the company should also be deemed capital stock, and the additional provision that it should be vested in the respective shareholders, according to their respective shares, only meant that they should have the interest of shareholders in the property, according to their respective shares.

The corporation in question was created to construct a

---

* Laws of Missouri of 1851, p. 479.          † Ib. 1853, p. 296.

railroad from a point in the city of St. Louis to the Iron
Mountain and Pilot Knob, in Missouri, with liberty to ex-
tend the road to the Mississippi River, or to the southern
part of the State. This road was constructed from St. Louis
to Pilot Knob, a distance of about eighty-seven miles, with
a branch to Potosi. During the progress of the work, and
in order to aid in its construction, the legislature of the
State, previous to 1860, passed various acts providing for the
loan of the bonds of the State to the company. All the acts
referred for the terms of the loans to an act passed in 1851
to expedite the construction of the Pacific Railroad and of
the Hannibal and St. Joseph Railroad.* That act provided
that no part of the bonds should be delivered to the company
until it signified its acceptance of them to the secretary of
state, by filing in his office a certificate of such acceptance
under the corporate seal of the company and the signature
of its president; that such acceptance should be recorded,
and upon its record should become to all intents and pur-
poses a mortgage of the road of the company, and every
part and section thereof, and its appurtenances, to the people
of the State, to secure the payment of the principal and in-
terest of the bonds. That act authorized the governor, in
case default was made in the payment of either the interest
or principal of the bonds, to sell the road and its appurte-
nances at auction to the highest bidder, or to buy in the
same at such sale for the use and benefit of the State, sub-
ject to such disposition in respect to the road or its proceeds
as the legislature might thereafter direct.

Under the different acts bonds of the State to a large
amount were issued to the company; its acceptance of them
in proper form was given to the secretary of state, and the
acceptance was duly recorded, and from the date of such
record the State acquired, for the payment of the principal
and interest of the bonds, a lien upon the road and every
part and section thereof and its appurtenances.

The company failed to pay the interest on these bonds.

---

* Laws of Missouri of 1851, p. 267.

It does not appear for how long a period the company was thus in default, nor is this material. It is sufficient to say that in 1865 the right of the State, under the provisions of the acts cited, to interfere and sell the property, had become complete. Before a sale, however, was made the legislature passed another act for the sale of this and other railroads by the governor, and the foreclosure of the State lien thereon. This act, which was approved in February, 1866, among other things required the governor to advertise for sale the different railroads, with their appurtenances, rolling stock, and property of every description, and all rights and franchises thereto belonging; and to sell the same at auction to the highest bidder, in pursuance of the several acts creating a lien thereon. It also provided for the appointment of three commissioners to attend the sale of the different roads as advertised, and to bid in the same for the use and benefit of the State for an amount not exceeding the respective liens thereon; and in case the roads were struck off and sold to them, to take possession of and hold the same, with their appurtenances and property, and again, after due advertisement, inviting proposals for the purchase of the different roads, their lands, appurtenances, and franchises, to resell the same. Under this act the St. Louis and Iron Mountain Railroad was advertised for sale, with its rights and privileges, and at the sale was bid in by the commissioners for the State. However broad the terms of the advertisement, the interest sold could not extend beyond the property upon which the State at the time held a lien, and this was the entire road of the company and its appurtenances. But as the property was sold to the State it is unnecessary to determine whether, if the sale had been made to a third party, the immunity from taxation possessed by the company would have passed to the purchaser. When the State became the purchaser the immunity ceased; the property stood in its hands precisely the same as any other unincumbered property of the State, exempt from taxation, not by virtue of any previous stipulation with the company, but as all property of the State is thus exempt. Subsequently the road and its

appurtenances, and all the franchises, which, under the new constitution of Missouri, adopted in 1865, were transferable by the State, were sold by the commissioners to McKay, Vogel, and Simmons, who conveyed the same to Thomas Allen, who with others, in July, 1867, became incorporated under the name of the St. Louis and Iron Mountain Railroad Company. That company is still in existence, and is one of the defendants herein. To it Allen transferred all the rights and privileges acquired by him from his vendors, and all which they acquired from the State. The act under which the sale was made provided that the purchasers of the road should have all the rights, franchises, privileges, and immunities which were enjoyed by the defaulting company under its charter and laws amendatory thereof, subject to the limitations and conditions therein contained, and not inconsistent with the act authorizing the sale. The new company thus acquired all the immunity from taxation which the original company had possessed, if it were competent for the legislature at the time, under the new constitution, to confer this privilege. The question, therefore, is, whether the legislature was competent to grant the immunity claimed, under that constitution, which went into operation on the 4th of July, 1865, previous to the passage of any of the acts authorizing the proceedings under which the new company acquired its rights.

The sixteenth section of the eleventh article of that instrument provides that "no property, real or personal, shall be exempt from taxation, except such as may be used exclusively for public schools and such as may belong to the United States, to this State, to counties, or to municipal corporations within this State;" and the twenty-seventh section of the fourth article declares that "the General Assembly shall not pass special laws . . . exempting any property of any named person or corporation from taxation."

These provisions require no explanation; they are absolute prohibitions against the grant of any new immunity from taxation, unless railroad companies of the State existing at the time are excepted from their operation. Such

exception is claimed under the "ordinance for the payment of State and railroad indebtedness," which accompanied the constitution and was adopted with it. That ordinance first provides for the levy and collection from different railroads, and among others from the St. Louis and Iron Mountain Railroad Company, an annual tax of ten per cent. on all their gross receipts for the transportation of freight or passengers (not including amounts received from and taxes paid to the United States) from the 1st of October, 1866, to the 1st of October, 1868, and fifteen per cent. thereafter; and then enacts that the tax shall be collected from the companies only for the payment of the principal and interest on the bonds of the State issued for their benefit, or on bonds guaranteed by the State; that if any of the companies refuse or neglect to pay the tax thus required, and the principal or interest of any of the bonds, or any part thereof, remain due and unpaid, the General Assembly shall provide by law for the sale of the railroad and other property and the franchises of such company under the lien reserved to the State; and that whenever the State becomes the purchaser of any railroad or other property, or the franchises thus sold, the General Assembly shall provide by law in what manner the same shall be sold for the payment of the indebtedness of the company; that no railroad or other property or franchises purchased by the State, shall be restored to the defaulting company until it shall have first paid the interest due from it, and that no sale or other disposition of any such railroad or other property, or its franchises, shall be made without reserving a lien upon the property and franchises thus sold or disposed of for all sums remaining unpaid.

Now, the argument of the appellants is that as the ordinance authorizes the legislature to provide for the sale of the franchises of a defaulting corporation, it can transfer under that designation immunity from taxation, if the company ever possessed such immunity; and that this was the effect of the sale of the St. Louis and Iron Mountain railroad and its franchises to McKay, Vogel, and Simmons.

And authority for this position is supposed to be found in the answers given by the judges of the Supreme Court of Missouri, in November, 1865, to certain questions propounded by the governor under a provision of the constitution authorizing him to take their opinion on important questions of constitutional law. The questions propounded were substantially these:

1st. Whether the provisions of the ordinance operated to suspend the right of the State to sell the roads named, or either of them, until there was a refusal or neglect to pay the tax imposed by the ordinance; or whether the State might order the sale of the railroads or either of them, prior to such refusal or neglect;

2d. If the judges were of opinion that a sale of the railroads might be ordered before such refusal or neglect, whether such sale could be made "without reserving a lien upon all the property and franchises thus sold for all sums remaining unpaid," or, in other words, whether this clause constituted a condition of *all* sales of railroads ordered by the State, or referred only to sales made under the ordinance for refusal and neglect to pay the tax.

3d. If the judges should be of opinion that all sales of railroads by authority of the State were subject to the restriction mentioned, whether the words "all sums remaining unpaid" referred to the sums for which the railroad sold was in default, or to that portion of the purchase-money not paid in cash at the time of sale; and,

4th. Whether upon a sale of a railroad under a lien of the State the constitution authorized the State to receive, in payment of the purchase-money, preferred or other shares of stock issued by a corporation purchasing the road.

None of these questions, as will be perceived, call for any opinion as to the effect of the sale of the franchises of a road, or the meaning of that term. They call only for an opinion upon the power of the legislature to order a sale of the roads, the liens to be reserved, the payments to be made, and the right to receive shares of stock of a purchasing corporation. The answer of the judges stated that the fifth

section of the ordinance related to all sales of railroads, whether in default for not paying the interest on the bonds of the State or not paying the tax levied; that when the State had become the purchaser of any railroad sold under the lien of the State, the General Assembly could provide in what manner such railroad could again be sold for the payment of the indebtedness which the State had incurred on account of bonds loaned to it or guaranteed for its benefit; that it would have had this power without the aid of the ordinance, but that no sale or other disposition of any such railroad, or other property, could be made by the State without reserving a lien upon the property sold for all sums remaining unpaid, and that the purchaser was required to make all payments therefor in money or in bonds or other obligations of the State; and then adds that the "legislature is left unrestricted further as to the time, terms, and conditions of the sale." This language is supposed to determine that in the sale of such property the legislature is not bound by the provisions of the constitution we have cited.

But we do not think the language used justifies any such conclusion, but was rather intended to indicate that the ordinance imposes no other restrictions than those designated, and has no reference whatever to the clauses of the constitution in respect to which no opinion was asked.

It seems to us that the plain meaning of the ordinance, when it says that the General Assembly shall provide by law in what manner the railroad and its franchises shall be sold, is that they shall be sold in conformity with such law as the legislature may constitutionally pass, not in conformity with any law which the legislature could devise if it had unlimited discretion in the matter. It would conflict with well-settled rules of construction to hold that the language used authorizes any legislation regardless of the provisions of the constitution. And there is nothing in the authority conferred to provide for the sale of its franchises with the road of the defaulting company, which requires immunity from taxation to be embraced within them. The language

evidently refers to such franchises as are essential to the operation of the road sold, without which the ownership of the road would be comparatively valueless, such as the franchise to run cars, to take tolls, and the like.

But if we are mistaken in this particular, we are clear that it never was intended by the ordinance to sanction, by the sale of the franchises of a defaulting corporation, the renewal of an exemption which had once ceased to exist, and which the constitution had declared should never thereafter be created. The inhibition of the constitution applies in all its force against the renewal of an exemption equally as against its original creation; and this inhibition the legislature could not disregard in providing for the sale of the property which it had purchased.

JUDGMENT AFFIRMED.