STATE OF MINNESOTA ex rel. JAMES N. MARR v. FRED STEARNS.

May 11, 1898.

Nos. 11,037—(31).

**Senate—President pro tempore Becoming Lieutenant Governor—Vacancy in Office of Senator.**

The president pro tempore of the state senate does not cease to be a senator when he becomes lieutenant governor by reason of a vacancy in the office of governor, and a corresponding vacancy in the office of lieutenant governor.

**Laws 1895, c. 168 — Taxation of Railroad Lands — Submission to Electors—Constitution.**

*Held,* that Laws 1895, c. 168, relating to the taxation of railroad lands, was duly enacted, and properly submitted at the general election of 1896 to the electors for adoption and ratification, as required by the constitution.

**Public Law — Ratification by Majority Vote of Electors — Judicial Notice of Number of Ballots Cast.**

The existence of a public law, whether it be in the form of a statute or a constitutional amendment, is a fact of which courts must take judicial notice. If, as in this case, its validity depends on the fact whether it was ratified by a majority vote of all the electors voting at the election at which it was submitted, the court will take judicial notice of the number of ballots cast at the election, and the number cast for the law, and inform itself as to such facts by resorting to the election returns and records in the office of the secretary of state, or in the offices of the several county auditors, or by any other means it deems safe and proper.

**Laws 1895, c. 168—Ratification by Majority Vote of Electors.**

*Held,* that the law here in question was adopted and ratified by a majority of all the electors voting at the election at which it was submitted.

**Same — Railway — Gross-Earnings Tax Validated by Const. art. 4, § 32a—Impairing Obligation of Contract.**

The statutes of this state (enacted subsequently to the adoption of the

constitution) providing for a commuted system of taxation of the property of railroad companies, by permitting them to pay an annual gross-earnings tax, in lieu of the taxation of their property on the basis of a cash valuation, were unconstitutional until validated by the constitutional amendment of 1871 (article 4, § 32a). Such validation was a qualified one, the right to repeal or amend the statutes being reserved; hence Laws 1895, c. 168, does not impair the obligation of any contract, and is constitutional.

Upon the petition of the relator, a resident and taxpayer of the county of Aitkin, the district court of that county granted him an alternative writ of mandamus requiring the county auditor of Aitkin county to place upon the tax list certain parcels of land described in the petition, to extend against such parcels their just proportion of taxes, and to cause the taxes to be collected, or to show cause why he had not done this. The matter having been duly submitted, the court, Holland, J., filed its findings and order that the relator was entitled to the relief prayed for, and thereupon judgment was entered making the alternative writ peremptory and directing the respondent as county auditor to place the lands described upon the tax list for 1897. From this judgment the respondent auditor appealed. Affirmed.

*Hadley & Armstrong,* for appellant.

Laws 1895, c. 168, was never passed by the state senate by the necessary vote of a majority of the members elected to that body. Const. art. 4, § 13. The courts may have recourse to the journals of the houses of the legislature to ascertain whether or not a law has been duly passed as provided in the constitution. Supervisors of Ramsey Co. v. Heenan, 2 Minn. 281 (330); State v. City of Hastings, 24 Minn. 78; State v. Gould, 31 Minn. 189; State v. Peterson, 38 Minn. 143; Lincoln v. Haugan, 45 Minn. 451. Mr. Day was lieutenant governor and was not a senator. Const. art. 5, § 6. The two offices are incompatible, and on his becoming lieutenant governor, the office of senator from the sixth district became vacant and remained vacant until his successor was elected and qualified. Const. art. 4, § 9. When a person holding one office accepts a new office incompatible with the one already held, the acceptance of the second office vacates the office previously held.

King v. Tizzard, 9 B. & C. 418; Stubbs v. Lee, 64 Me. 195; State v. Goff, 15 R. I. 505; Kerr v. Jones, 19 Ind. 351; People v. Nostrand, 46 N. Y. 375, 381; People v. Hanifan, 96 Ill. 420; State v. Hutt, 2 Ark. 282; Scott v. Strobach, 49 Ala. 477. The constitution prohibits the lieutenant governor from voting as senator. Const. art. 3, § 1; art. 4, § 1; art. 5, § 1. The stability of our peculiar form of government depends largely upon the separation of the three functions of the government, the executive, the legislative and the judicial. Story, Const. § 520; Bryce, Am. Com. 212; Minnesota Const. Debates, 185–202; De Chastellux v. Fairchild, 15 Pa. St. 18; People v. Draper, 15 N. Y. 532; Cooley, Const. Lim. 44, 78; Const. art. 13, §§ 3, 4. If the lieutenant governor may vote as a de-facto senator, there is nothing in our constitution that prevents the governor from doing the same thing under like circumstances. State v. Francis, 26 Kan. 724.

Laws 1895, c. 168, was not legally submitted to the people for ratification and adoption at the general election of 1896. Const. art. 4, § 32a. This constitutional provision must be complied with in a reasonable manner. The question as to the adoption or rejection of the act in question must be submitted to the voters of the state in such a manner that a person of ordinary intelligence will understand what he is doing when he votes upon the question. Laws 1893, c. 4, § 28 (G. S. 1894, § 33). Even assuming that the law had been properly enacted by the senate and properly submitted to the people at the election, it was not adopted or ratified by the popular vote. The printing of the law with Laws 1897 is no evidence of the adoption and ratification of the law. The statutes having provided how the result of the election shall be ascertained and certified, the court will take judicial notice of the result of the canvass of votes made in accordance with the law. G. S. 1894, §§ 1, 169, 170, 171, 178, 179; Laws 1895, c. 168, § 4. The certificate of the state canvassing board does not give the total number of ballots cast nor the total number of electors voting at the election. It does not purport to determine the result of the vote upon the law in question, but merely makes the statement that "For taxation of railroad lands 'Yes' received 235,585 votes; 'No' received 29,530 votes." The language used in the constitu-

tion, "a majority of the electors of the state voting at the election," means a majority of all the electors who vote at the election upon any matter, and not a majority of those who vote upon this particular question. Taylor v. Taylor, 10 Minn. 81 (107); Dayton v. City of St. Paul, 22 Minn. 400; Smith v. Board of Co. Commrs., 64 Minn. 16. The total number of ballots cast, which would be the same as the total number of electors voting at the election, is not contained and cannot be made out from the certificate of the state canvassing board.

Laws 1895, c. 168, does not apply to the granted lands of the St. Paul & Duluth Railroad Company, for the reason that there was prior to its enactment a binding contract between the railroad company and the state, that the railroad company should pay a certain percentage of its gross earnings to the state, and that such payment should be in lieu of all other taxation on those lands as long as they were owned by the company. Hence an application of chapter 168 to those lands would be a breach of that contract in violation of the constitution of the state and also of the constitution of the United States. Sp. Laws 1865, cc. 2, 8. When there are no constitutional limitations upon the legislature of a state, it may make contracts with corporations or individuals, either that certain property shall be exempt from all taxation, or that a certain fixed sum shall be paid in lieu of all other taxation, and such contracts are irrepealable. First Div. St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297); State v. Winona & St. P. R. Co., 21 Minn. 472; City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469; St. Paul & C. Ry. Co. v. McDonald, 34 Minn. 195; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467; Cooley, Const. Lim. 127; State v. Wilson, 7 Cranch, 164; Gordon v. Appeal Tax Court, 3 How. 133; State Bank v. Knoop, 16 How. 369; Jefferson B. Bank v. Skelly, 1 Black, 436; University v. People, 99 U. S. 309; Asylum v. New Orleans, 105 U. S. 362; Pearsall v. Great Northern Ry. Co., 161 U. S. 646, 662. All the provisions of Sp. Laws 1865, c. 8, are intended to be binding upon the state and not to be changed without the consent of the railroad company. State v. Luther, 56 Minn. 156. The act shows consideration from the company to the state. If Sp. Laws 1865, cc. 2, 8, were invalid for violation of

Const. art. 9, §§ 1, 3, they were validated by the constitutional amendment of 1871. State v. Luther, supra.

*C. W. Bunn*, for appellant. (With respect to lands owned by Northern Pacific Railroad Company.)

Sp. Laws 1865, c. 8, and Sp. Laws 1870, c. 65, constitute a contract between the Northern, Pacific and the state, and Laws 1895, c. 168, if held to have been properly passed, is void because it impairs the obligation of that contract. These laws did not violate Const. art. 9, §§ 1, 3. The system of providing for taxation of railroad lands through payment of a percentage of the gross earnings of the road in lieu of all other taxes was universally in vogue in territorial times before the adoption of the constitution, and after that date the state legislatures invariably assumed that they continued to possess the same power, whether the railroad grant was the absolute property of the state or granted to the state by congress. This was the practice, not only as to old grants adopted before the constitution, but also as to new grants, both state and congressional, made after that date. State v. Luther, 56 Minn. 156, 163. A constitution may acquire a construction or meaning by universal and long-continued practice which should be held controlling. Carson v. Smith, 5 Minn. 58 (78); Green v. Knife Falls B. Corp., 35 Minn. 155; City of Faribault v. Misener, 20 Minn. 347 (396); Ames v. Lake Superior & M. R. Co., 21 Minn. 241, 288.

Sections 1 and 3 of article 9, read technically and literally, are contradictory. Section 1 says that all taxes shall be as nearly equal as may be, and all property on which taxes are to be levied shall have a cash valuation and be equalized and uniform throughout the state. Under this section the legislature is clearly given the right to determine what property shall bear the burden of taxation, to classify property, and to levy taxes upon one class of property by a different rule from that applied to other classes of property; it may exempt from all taxation any property or any class of property, or it may for example tax improved property by a percentage on rental or income, unimproved property directly by ascertaining its value. This constitutional provision is the com-

mon one adopted in the constitutions of a dozen or more western and southern states. On the other hand, section 3 did not accompany in any of the ·other states constitutional provisions similar to those contained in section 1. Section 3 was adopted with slight changes from Ohio. See Debates Constitutional Convention, 1857. But in Ohio section 3 was the only provision touching the subject. Our constitutional convention adopted section 1, which is substantially the constitution of Wisconsin, Illinois, Iowa, Missouri, Kansas and other states, accompanied with section 3, taken from Ohio; and taken, it may be noted, after a well-known decision of the Ohio supreme court holding that it was unconstitutional to provide for a deduction of debts against credits. Exchange Bank v. Hines, 3 Oh. St. 1. In this state the two provisions must be construed together, both as operative and as modifying each other. Some construction must be adopted which will give the fullest effect to both section 1 and section 3. While it must be admitted, as decided in LeDuc v. City of Hastings, 39 Minn. 110, that the legislature cannot exempt any property, except of classes enumerated in section 3, still it remains to be decided whether, taking both sections together, the legislature is absolutely bound to assess all property by a specific, direct appraisal of its value in money. Section 3 is not self-executing but is directory to the legislature. And therefore it may well be held that section 3 was not intended to overrule section 1 so far as concerned the power of the legislature to determine where the burdens of taxation should be placed (of course, without unjust discrimination) and to classify property into different classes for the purposes of taxation. See Wisconsin C. R. Co. v. Taylor Co., 52 Wis. 37; Trustees of Griswold College v. State, 46 Iowa, 275; Missouri R. F. S. & G. R. Co. v. Morris, 7 Kan. 210; Francis v. Atchison, T. & S. F. R. Co., 19 Kan. 303; Louisiana St. L. Co. v. New Orleans, 24 La. An. 86; New Orleans v. Kaufman, 29 La. An. 283; New Orleans v. Davidson, 30 La. An. 554; New Orleans v. Fourchy, 30 La. An. 910; People v. Auditor-General, 7 Mich. 84; State v. Runyon, 41 N. J. L. 98; Kittanning Coal Co. v. Com., 79 Pa. St. 100; Mississippi Mills v. Cook, 56 Miss. 40; Illinois Cent. R. Co. v. McLean, 17 Ill. 291; Hunsaker v. Wright, 30 Ill. 146; State v. County Ct., 19 Ark. 360; St. Louis, I. M. & S. Ry. Co. v.

Berry, 41 Ark. 509; Arkansas M. R. Co. v. Berry, 44 Ark. 17; Cairo & F. R. Co. v. Parks, 32 Ark. 131; Memphis & L. R. Co. v. Berry, 41 Ark. 436.

The constitutional limitations on legislative power of article 9 have no application to public lands which passed into private ownership with the privilege of commuted taxation created with respect to them while they were yet public lands. City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469.

*Clapp & Macartney*, for appellant. (With respect to lands owned by St. Paul & Duluth Railroad Company.)

It has been repeatedly held that a constitutional provision requiring property to be uniformly assessed and taxed, or requiring property to be assessed at its true value, or at its actual value, does not prohibit a legislature from commuting a tax, or from contracting for its release, for a consideration. Cooley, Const. Lim. (4th Ed.) 463. It is a practical and very general course to require corporations to pay an annual per centum in lieu of state taxes, and, in some states, in lieu of all other taxes. Burroughs, Taxn. § 53; Hunsaker v. Wright, 30 Ill. 146; Board of Supr. v. Campbell, 42 Ill. 491; Chicago v. Sheldon, 9 Wall. 50; Kneeland v. Milwaukee, 15 Wis. 454; Dean v. Gleason, 16 Wis. 1; Wisconsin C. R. Co. v. Taylor Co., 52 Wis. 37. Const. art. 9, § 3, is not self-executing. The direction to the legislature to pass such laws can have no force because there is no means of enforcing such direction. The imposition of a duty upon the legislature cannot be construed as a limitation upon its powers, because the power of the legislature is plenary, and can only be restrained by plain limitations. Curryer v. Merrill, 25 Minn. 1; Ames v. Lake Superior & M. R. Co., 21 Minn. 241, 281. The amendment of 1871 was not only a ratification of the acts subsequent to the adoption of the state constitution, but was a construction by the people in adopting the amendment of such acts, and a recognition of their validity. The only constitutional objection to the legislature entering into a contract with the company for a commuted system of taxation was sections 1 and 3 of article 9, and this went not to the general power to make a contract but to provide a commuted system of taxation; and, if

that was validated, the entire contract was validated, not only upon principle, but upon the rule of law that a ratification of a contract made by an agent, without authority, is a ratification of the whole contract. Strasser v. Conklin, 54 Wis. 102. The land in question was never the subject of or affected by any prohibition contained in the state constitution. The lands never became—and there was no possibility by which they could become—a part of the public domain for taxable purposes, except by the terms of a contract. Since the contract in question contained the provision relative to taxation, the lands were not, until they passed beyond the range of that contract, within the purview of article 9. People v. Auditor-General, 7 Mich. 84. See First Div. St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297); State v. Winona & St. P. R. Co., 21 Minn. 315; State v. Winona & St. P. R. Co., 21 Minn. 472.

*M. D. Grover*, for appellant. (With respect to lands owned by Great Northern Railway Company.)

*A. Y. Merrill* and *H. W. Childs*, Attorney General, for respondent.

The form of submission of Laws 1895, c. 168, was sufficient. Worman v. Hagan, 78 Md. 152, 164; Nesbit v. People, 19 Colo. 441. The court will take judicial notice of the adoption and ratification of the law. Division of Howard County, 15 Kan. 194, 213. Under the constitution the law became effective eo instanti upon its adoption and ratification. No fault, whether of commission or omission, on the part of the election officers could change or affect the result. Prohibitory Amendment Cases, 24 Kan. 700, 714; Seneca M. Co. v. Osmun, 82 Mich. 573. Granting that the state canvassing board did not strictly comply with the law in any respect, the will of the people of the state cannot be thereby defeated. Prince v. Skillin, 71 Me. 361; 1 Greenleaf, Ev. (Lewis' Ed.) § 6; New York & M. L. R. Co. v. Winans, 17 How. 30, 41; Brown v. Piper, 91 U. S. 37. It was not in the power of the legislature to enter into a contract with either of the railroads whereby either of them would be relieved of its just proportion of taxation. See Primm v. City of Belleville, 59 Ill. 142; Bright v. McCullough, 27 Ind. 223; City of Zanesville v. Richards, 5 Oh. St. 590; Exchange Bank v. Hines, 3 Oh. St. 1; Lehigh I. Co. v. Lower Macun-

gie Tp., 81 Pa. St. 482; Northampton v. County Commrs., 145 Mass. 108; Lumsden v. Cross, 10 Wis. 282; Norris v. City of Waco, 57 Tex. 635; People v. Whyler, 41 Cal. 351; Stinson v. Smith, 8 Minn. 326 (366); State v. U. S. & C. Exp. Co., 60 N. H. 244; Tucker v. Ferguson, 22 Wall. 527; Bailey v. Magwire, 22 Wall. 217; Erie Ry. Co. v. Pennsylvania, 21 Wall. 492; Union P. R. Co. v. Philadelphia, 101 U. S. 528; Salt Co. v. East Saginaw, 13 Wall. 373; Welch v. Cook, 97 U. S. 541; New Orleans C. & L. R. Co. v. New Orleans, 143 U. S. 192; Ohio L. I. & T. Co. v. Debolt, 16 How. 416; Providence Bank v. Billings, 4 Pet. 514, 561; Philadelphia & W. R. Co. v. Maryland, 10 How. 376, 393; Jefferson B. Bank v. Skelly, 1 Black, 436, 447; Delaware R. Tax, 18 Wall. 206, 225; Christ Church v. County of Philadelphia, 24 How. 300; New Jersey v. Wilson, 7 Cranch, 164; West Wisconsin R. Co. v. Board of Supr., 93 U. S. 595; Railroad Co. v. Gaines, 97 U. S. 697; Memphis G. L. Co. v. Shelby Co., 109 U. S. 398; First Div. St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297); State v. Winona & St. P. R. Co., 21 Minn. 315; City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467.

START, C. J.

This is an appeal from the judgment of the district court of the county of Aitkin, adjudging that a peremptory writ of mandamus issue, directing the appellant, as county auditor, to place three certain parcels of land upon the tax list of the county for the year 1897.

The first tract is the property of the St. Paul & Duluth Railroad Company, the second is owned by the Northern Pacific Railroad Company, and the last belongs to the Great Northern Railway Company. Each of the railway companies acquired its land by grants from the state or United States made after the adoption of our constitution, and all statutes affecting the question of their taxation were enacted subsequently to that event. No part of the lands here in question are in any manner connected with, or used in the operation of, the railways of the respective companies; and they do not, and will not when sold, increase the aggregate of the gross earnings of the companies, upon which they pay a tax.

The trial court held, in effect, that these lands are now taxable, by virtue of the provisions of Laws 1895, c. 168, relating to the taxation of certain lands owned by railroad companies. The appellant claimed that this chapter was never enacted by the legislature, nor submitted to, and adopted and ratified by, the electors of the state; but that, if it was, it is void, because it impairs the contract between the state and the railroad companies as to taxation of their lands and other property.

1. The first objection made to this statute is to the effect that in the state senate it did not receive the necessary vote of a majority of the members elected to that body, because the Honorable Frank A. Day, who voted for the bill and whose vote was necessary to pass it, was not then a senator, and his vote thereon was void. Assuming that the question whether this statute ever passed the senate depends upon the legality of Mr. Day's vote, we hold that his vote was not a nullity, and that the bill was properly passed.

The undisputed facts as to this question are that Mr. Day was duly elected as a senator from the Sixth senatorial district of this state for the term of four years, commencing January, 1895. He qualified, entered upon the duties of the office, and on January 25, 1895, became president pro tempore of the senate. Six days thereafter, Governor Nelson resigned, and Lieutenant Governor Clough became governor; and thereafter, until the close of the Twenty-Ninth session of the senate, Mr. Day performed the duties of, and acted as, lieutenant governor. He also, until the close of the session, continued to act and vote as senator, with the tacit approval, at least, of the senate. Upon the opening of each day's session of the senate, and upon every call of the house, and upon all votes taken upon any bill or resolution, his name was regularly called as one of the senators.

The conclusion which the appellant claims from these facts is that Mr. Day ipso facto became lieutenant governor when Governor Clough became governor, and that thereafter he was not, and could not, under the constitution, be a senator, either de jure or de facto. This conclusion is based upon the proposition that whenever the lieutenant governor becomes governor during a vacancy in

72 M.—14

that office for any cause, and the president pro tempore becomes lieutenant governor by reason 'of a vacancy in the latter office, his office as senator becomes absolutely vacant.

The provisions of the constitution which have a bearing directly or indirectly on this question are these:

(a) The powers of government shall be divided into three distinct departments, legislative, executive and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers belonging to either of the others, "except in the instances expressly provided in this constitution." The legislature of the state shall consist of the senate and house of representatives. The executive department shall consist of a governor, lieutenant governor, etc. The lieutenant governor shall be ex officio president of the senate, and in case a vacancy shall occur, from any cause whatever, in the office of governor, he shall be governor during such vacancy. The compensation of a lieutenant governor shall be double the compensation of a state senator. Before the close of each session of the senate, they shall elect a president pro tempore, who shall be lieutenant governor in case a vacancy shall occur in that office. Const. art. 3, § 1; Id. art. 4, § 1; Id. art. 5, §§ 1, 6.

(b) Each house shall be the judge of the election returns and eligibility of its own members. The house of representatives shall elect its presiding officer. No senator or representative shall, during the time for which he is elected, hold any office under the authority of the United States or the state of Minnesota, except that of postmaster. Every bill, having passed both houses, shall be carefully enrolled, and shall be signed by the presiding officer of each house. Const. art. 4, §§ 3, 5, 9.

(c) The house of representatives shall have the sole power of impeachment. All impeachments shall be tried by the senate; and, when sitting for that purpose, the senators shall be upon oath. All the officers in the executive department (except the lieutenant governor), and the judges of the supreme and district courts, may be impeached and removed from office for corrupt conduct therein. No officer shall exercise the duties of his office after he shall have been impeached, and before his acquittal. On the

trial of an impeachment against the governor, the lieutenant governor shall not act as a member of the court. Const. art. 4, § 14, and Id. art. 13, §§ 1, 3, 4.

The constitution was intended to provide a complete and harmonious scheme of state government, and to provide against the possibility of any interregnum in the office of governor, or interruption in the exercise of the functions and powers of that office. The several provisions of the constitution we have quoted were adopted at the same time, and must be construed together, as a whole, and with reference to the purposes for which the constitution was ordained. It is not permissible to select a single, isolated provision, and give it effect according to its literal reading, without reference to modifications made by the express language of other provisions of the instrument. The contention of the appellant that whenever there is a vacancy in the office of lieutenant governor the president of the senate pro tempore becomes as fully and completely lieutenant governor, for the residue of the term, as if he had been originally elected, and thereupon his office of senator becomes absolutely and permanently vacant as to him, cannot be sustained without disregarding both the letter and spirit of the constitution, when considered as a whole, and without adopting a construction well calculated, when party strife and spirit are intense, to disturb the public peace and order.

If, as claimed, the president pro tempore of the senate becomes lieutenant governor for the residue of the term in case of a vacancy in that office, it necessarily follows that the lieutenant governor, when he becomes governor in case of a vacancy in the latter office for any cause, holds that office for the residue of the term; or, in other words, if a vacancy, from any cause, in the office of governor or lieutenant governor occurs, it is necessarily an absolute and permanent one. This proposition, if correct, would logically tend to support the further claim that, when the president pro tempore once becomes lieutenant governor, his office of senator is absolutely and permanently vacant as to him. On the other hand, if the constitution recognizes both permanent and temporary vacancies in the offices of governor and lieutenant governor, such fact has an important bearing on the question whether the president pro

tempore ceases to be a senator when he becomes a lieutenant governor. This brings us to the consideration of the meaning of the word "vacancy," as used in the constitution in reference to the office of governor and lieutenant governor.

The constitution provides that the lieutenant governor shall be ex officio president of the senate, and in case a vacancy shall occur, from any cause whatever, in the office of governor, he shall be governor during such vacancy; but it does not in express terms declare when, or for what causes, a vacancy shall exist in the office of governor. The language used, however, clearly implies that such vacancy may occur from several causes, and may be either permanent or temporary. This was the construction given to the constitution by the first legislature convened after its adoption, which provided that in case of death, impeachment, resignation or removal of the governor from office, the lieutenant governor shall exercise the office of governor until he be acquitted or another governor shall be duly qualified. Laws 1858, c. 87, § 10. Again, within a few years after the adoption of the constitution and during the Civil War, the lieutenant governor, as governor ad interim, exercised the powers and discharged the duties of the office of governor during the necessary absence of the governor from the state.

The governor may be impeached, but he is forbidden by the constitution to exercise any of the duties of his office after he has been impeached, and before his acquittal. The time between the preferring of articles of impeachment against him by the house of representatives and the close of his trial by the senate may be several months. The office cannot remain vacant during such time, for there can be no suspension of the powers and duties of the office of chief executive. The power and duty to command the military forces of the state, to execute the laws, to suppress riots and insurrections, to fill vacancies in office, and to grant and demand the surrender of fugitives from justice, are of necessity continuous, and the necessity for their exercise may arise at any time. The powers of the office must be exercised during such vacancy by some one, and the constitution provides that the lieutenant governor shall be governor during such vacancy. Necessarily, in case of the impeachment of the governor, such vacancy may be either

permanent or temporary, depending on the verdict of the senate. If it convicts, the vacancy is permanent. If it acquits, it is temporary. If the vacancy in the office of governor occasioned by his impeachment is not to be filled, the state government is without an executive head for months. But if the vacancy is filled by the lieutenant governor, and he thereby becomes governor, "as fully and completely * * * as though he had been legally elected in the first instance to that office," then to prefer articles of impeachment against the governor is to remove him permanently from office, although the senate promptly acquit him. Such a construction of the constitution would be a menace to the peace and order of the state.

If the governor is incapacitated by illness so that he cannot exercise the powers of his office, then, if the proposition contended for by the appellant is correct, either the office must remain vacant during his illness, or be filled by the lieutenant governor for the balance of the term. In such a case there is no escape from the conclusion that either there is to be an interregnum in the office of governor during his illness, which may or may not continue to the end of his term, or that his illness at once permanently removes him from office, although he speedily recovers. A construction of the constitution which would lead to the results suggested by these illustrations must be rejected.

It is clear that the vacancy in the office of governor provided for by the constitution may arise from a variety of causes, such as his death, resignation, impeachment, illness or absence from the state, that it is necessarily permanent or temporary according to the facts of each case, that the lieutenant governor is governor only during such vacancy, and that in case of a temporary vacancy he is governor only for the time being, and, when the temporary vacancy ends, the governor returns to his office, and the lieutenant governor to his. A corollary of this proposition is that the vacancy in the office of lieutenant governor, upon the occurrence of which the president pro tempore of the senate becomes lieutenant governor, is of the same character as the vacancy in the office of governor. The vacancy in the office of lieutenant governor may be permanent or temporary, depending on the character, cause and

duration of the vacancy in the office of governor. Such being the case, the president pro tempore, when he becames lieutenant governor for the time being during such vacancy, ought not to be held to be no longer a senator, unless the express words of the constitution imperatively require such a construction. There are no such words or provisions in the constitution, and such a construction cannot be given to it, and at the same time give effect to other provisions of that instrument.

All the reasons we have suggested why the office of lieutenant governor does not become absolutely and permanently vacant, as to that officer, as soon as he is called upon to act as governor during a temporary vacancy, apply with greater force to the president pro tempore of the senate; for if the senatorial office of the president pro tempore is rendered absolutely vacant, as to him, by his becoming lieutenant governor, then such a result follows upon the happening of the first vacancy in the office of governor for any cause, or for any duration; and, in case such vacancy is only temporary, then at its termination the governor resumes his office, the lieutenant governor his, and the president pro tempore will be out of office entirely, and the people of his district deprived of the right to be represented in the senate until his successor can be elected. There is no language in the constitution requiring or justifying the conclusion that the senatorial office of the president pro tempore becomes vacant when he becomes lieutenant governor by reason of, and during, a vacancy in the office of governor. On the contrary, there is no escape from the conclusion that the president pro tempore does not cease to be a senator when he becomes lieutenant governor by reason of a vacancy in the governor's office.

This conclusion is further supported by the character of the duties of lieutenant governor and of the president pro tempore. They are identical. Neither of them has any power or duty properly belonging to the executive department. True, the lieutenant governor is declared to be an officer of the executive department, and it is declared that no person belonging to one of the departments shall exercise any of the powers properly belonging to either of the others, except in instances expressly provided for by the

constitution; but the fact remains that this classification is simply one of convenience, and that he is not authorized to exercise a single power or to perfom a single duty, as lieutenant governor, properly belonging to the executive department. His sole constitutional duties are to preside over the senate (he is not a member thereof and has no vote, even in cases where the senators are evenly divided), and to authenticate by his signature the bills passed by the senate. These duties and powers belong strictly and properly to the legislative department. They are the precise duties imposed by the constitution on the presiding officer of the house of representatives, and there is just as much reason for claiming that the speaker of the house, when elected, ceases to be a member thereof, as there is to claim that a senator who is president pro tempore ceases to be a senator when he becomes lieutenant governor.

That it was not intended by the constitution to confer executive powers upon the lieutenant governor, as such, is also apparent from the fact that he cannot be impeached, although all the other officers of the executive department may be. A senator, therefore, when he becomes lieutenant governor because he happens to be president pro tempore of the senate, is not called to the discharge of any executive duties. All his new duties properly belong to the legislative department, and there is no reason why his senatorial office should become vacant, but every reason to the contrary. There is just as much warrant in the constitution for claiming that a senator ceases to be such when he is elected president pro tempore as there is to claim that such result follows when he becomes lieutenant governor.

It is suggested that the constitution does not require the senate to elect one of its own members its president pro tempore. Neither does it expressly require that the presiding officer of the house of representatives shall be a member thereof. But from the adoption of the constitution to the present time the presiding officers of the senate and house have always been members of the body over which they were elected to preside. This practical construction of the constitution is the correct one, with the possible qualification that no senator under the age of 25 years can be elected

president pro tempore, for the reason that both the governor and lieutenant governor must be at least 25 years of age.

The prohibition of the constitution that no senator or representative shall, during the time for which he is elected, hold any office except that of postmaster, is relied upon by counsel for appellant in support of the proposition that when Mr. Day became lieutenant governor he ceased to be senator. They state, in one of the briefs, the argument thus: "That the two offices of lieutenant governor and senator are incompatible is made explicit by this provision. The result must follow that, Mr. Day having become lieutenant governor, he ceased to be senator."

If the premises of counsel are correct, they are fatal to their conclusion, for Mr. Day was a senator before he was either president pro tempore or lieutenant governor. He was a de jure senator, constitutionally elected for the term of four years, during which time he was prohibited from holding any other office under the authority of the state, even if he resigned the office of senator. The result must follow from a literal reading of the section, that, being ineligible to any other office, he continued to be a de jure senator. It is obvious that this section of the constitution does not, explicitly or otherwise, make the offices of lieutenant governor and senator incompatible, or a senator ineligible to the office of lieutenant governor during the term for which he was elected; for it is otherwise expressly provided by the constitution, that a senator who is president pro tempore shall become lieutenant governor in case of a vacancy. Indeed, this particular section has but little relevancy to the question under consideration, except to emphasize the necessity of construing the several provisions of the constitution as a harmonious whole, and not each section by itself.

There remains one other provision of the constitution to be considered in this connection, which is inconsistent with the appellant's claim. "On the trial of an impeachment against the governor, the lieutenant governor shall not act as a member of the court." Art. 13, § 4. This is an express recognition of the fact that a senator may be a lieutenant governor; for the court for the trial of impeachments is the senate, and it is composed exclusively of senators, who shall be upon oath. If in such cases the lieuten-

ant governor was not also a senator, he could not take the oath as senator and act as a member of the court; but the constitution provides for cases where the lieutenant governor is also a senator and would, except for this express prohibition, be entitled to act as a member of the court, as senator. This prohibition would be wholly unnecessary, except upon the assumption that a senator did not vacate his office on becoming lieutenant governor. Our conclusion is that Mr. Day did not cease to be senator when he became lieutenant governor.

2. Was the law (Laws 1895, c. 168) submitted to the electors in compliance with the constitution and the statute? We answer the question in the affirmative. Const. art. 4, § 32a, adopted in 1871, provides as follows:

"Any law providing for the repeal or amendment of any law or laws heretofore or hereafter enacted, which provides that any railroad company now existing in this state, or operating its road therein, or which may be hereafter organized, shall in lieu of all other taxes and assessments upon their real estate, roads, rolling stock and other personal property, at and during the time and periods therein specified, pay into the treasury of this state a certain percentage therein mentioned of the gross earnings of such railroad companies now existing or hereafter organized, shall, before the same shall take effect and be in force, be submitted to a vote of the people of the state, and be adopted and ratified by a majority of the electors of the state voting at the election at which the same shall be submitted to them."

The form of the submission of the act in question to the electors, as printed on the ballots, was this:

| | | |
|---|---|---|
| For taxation of railroad lands. | Yes. | |
| | No. | |

The appellant claims that: "The form of ballot adopted was a cunning political device to catch votes; an evasion of the constitution, which requires that the law itself shall be submitted to the voters,"—hence it was never submitted to the vote of the people. The question here is not whether the form of the ballot selected by the legislature is the best and fairest that could have been framed by a trained lawyer. But it is, did the form of ballot actually used comply with the constitution?

Neither the form nor the manner of submitting the question of the amendment to the people is prescribed by the constitution. They are left to the judgment and discretion of the legislature, subject only to the implied limitation that they must not be so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the law to a popular vote. It cannot be claimed, in reason or justice, that this case falls within this limitation. The form was prescribed by the act itself, which was a public statute, so far as it was in the power of the legislature to make it such. It was published with the Laws of 1895, and fully advised the electors, not only as to the provisions of the act, but also how they were to express their decision upon the question of ratifying the act. The constitution requires that all amendments to that instrument shall be submitted to the people for their approval or rejection. Art. 14, § 1. There is no essential difference between this requirement and the one as to the submission of the law in question. Therefore, if it was necessary to print the law upon the ballot or to refer to it by its title, then the same particularity would be required in submitting constitutional amendments. Such, however, has not been the legislative or practical construction of the constitution, for there are a large number of important amendments to the constitution which were submitted by a ballot upon which there was no suggestion as to the nature of the amendment. It has never been suggested that such amendments are void. The act in question was properly submitted to the people.

3. The act under consideration is further assailed on the ground that it was not ratified by the popular vote.

The law was submitted to the people at the general election of 1896, and there were cast and counted for it 235,585 votes, and 29,530 votes against it; but, by virtue of the constitution, it was not adopted and ratified, unless a majority of all the electors who voted at the election voted for it. A majority in favor of it of all the votes cast upon the proposition is not sufficient. It is conceded that the vote on the proposition was as we have stated. It is then mathematically true that the law was adopted by a majority of all the electors, unless there were cast at the general election of 1896 at least 471,170 ballots. Courts will take judicial notice of

whatever is generally known within the limits of their jurisdiction. 1 Greenleaf, Ev. § 6; Lanfear v. Mestier, 89 Am. Dec. 663, notes. Now every intelligent man in the state knows, from the census and election returns and the general and political history of the state, that there were not cast at the last general election 471,170 votes.

We do not, however, rest our conclusion that this law received a majority of all the votes cast at the election upon this ground, but we rest it upon the broad ground that the existence of a public law is a fact of which courts will take judicial notice without pleading or proof. Judicial notice does not depend upon the actual knowledge of the judges. When the fact is alleged, they must investigate, and may refresh their recollections by resorting to any means which they may deem safe and proper. Brown v. Piper, 91 U. S. 37, 42; Gardner v. The Collector, 6 Wall. 499. Courts, however, do not take judicial notice of votes and elections, except so far as they affect the validity of some public law. The rule is stated by Judge Brewer in these words:

"The courts are to know what is and what is not a public law of the state, what is and what is not a part of the constitution, and, to that end, must take judicial notice of everything, near or remote, that determines such fact. This argument condensed, is this: The courts take judicial notice of what is public law, statutory or constitutional. When a majority of the electors voting on an amendment, at an election properly ordered, adopts it, then it becomes a part of the constitution. So the constitution itself says. The courts must judicially know whether such amendment has been adopted, and is in fact a part of the constitution, and to that end, if need be, must take judicial notice of every ballot cast at that election." Prohibitory Amendment Cases, 24 Kan. 700, 715.

The rule is stated in State v. Cooley, 56 Minn. 540, 554, 58 N. W. 154, thus: Courts will "take judicial notice of all facts bearing on the constitutionality of the law."

The validity of this law depends upon whether it received a majority of all the votes cast at the election, not on the subsequent act or omission of the state canvassing board, or of any other officers. For the purpose of determining this fact, the court will take judicial notice of the election records, returns and canvass

thereof by the state board in the office of the secretary of state, and, if necessary, of the election returns and canvass in the offices of the several county auditors of the state. We have found it necessary to refer only to the election returns and records in the office of the secretary of state, and have there found appropriate, clear and satisfactory information upon the question whether the act was adopted and ratified by a majority of the electors voting at the election, and are able to, and do, answer the question in the affirmative.

The election returns in the office of secretary of state on December 22, 1896, when the votes were canvassed by the state board, showed that the total number of ballots cast at the last general election was 343,319; but no returns as to the total number of ballots cast had then been received from seven counties, and the board made no declaration to the effect that the law had been adopted. Their certificate gave only the vote for and against the proposition. Shortly after the canvass, and before the trial of this action in the district court, a return certified by the county auditor was received from each of the seven counties, giving in the aggregate the total number of ballots cast at the election in his county. These returns show that the total ballots cast in the seven counties were 17,979, which, added to the 343,319 previously returned from the other counties, give 361,298 as the total number of ballots cast at the election. As no elector was authorized to cast more than one state ballot, it follows that 361,298 electors voted at the election, and no more. It was therefore necessary that 180,650 votes should be cast for the law, in order to adopt it. It received 235,585 votes, or 54,935 more than were legally necessary.

4. This brings us to the last contention of the appellant. It is, in effect, that the several statutes of the state providing for the payment by the several railway companies of a gross-earnings tax in lieu of taxation of their property in specie are irrevocable contracts between the state and the companies, the obligations of which Laws 1895, c. 168, impairs.

It must be conceded, in obedience to the decisions of the supreme court of the United States, that a state may by its legislature, in the absence of constitutional inhibitions, irrevocably limit

or contract away its right of taxation. It is, however, as decisively settled by the same court that the taxing power of the state will not be held to have been surrendered or limited unless such surrender is expressed in terms too clear to admit of a doubt. It must be expressed in clear, unambiguous language, which will admit of no reasonable construction consistent with the reservation by the state of the unimpaired power of taxation; for it is a sovereign power, absolutely essential to the continued existence of the state.

It is not necessary here to set out the terms of the several statutes under which it is claimed that the lands of the railway companies are exempt from taxation in the usual manner of taxing real estate. They, in effect, provide for a commuted system of taxing railroad property, by permitting the railway companies to pay annually to the state a specified percentage on their gross earnings, in full of all other taxes and assessments on their property. The St. Paul & Duluth Railroad Company and the Northern Pacific Railroad Company accepted the provisions of these statutes. The Great Northern Railway Company never has. Under the canon of construction applicable to statutes which are claimed irrevocably to limit or absolutely to relinquish the power of taxation by the state, it is not clear that the statutes here in question can be construed as irrevocable contracts; for the language used is not so specific as to preclude all argument, inference or presumption against the claim of the appellant. The statutes do not contain any express stipulations that the percentage shall not be increased or diminished, or that the system of taxation shall not be changed to meet changed conditions in the future. What might have been a fair and equal gross-earnings tax when these statutes were enacted might be grossly unequal under changed conditions, such as an increase in the value of the land grants of the companies, or the necessity for an increase in the rate of taxation for state, county, school and local purposes.

But it is not our purpose to decide the question here suggested; for we place our decision, that the statutes under which the railroad companies claim do not constitute irrevocable contracts between them and the state that their lands shall never be taxed as other land is taxed by the state, upon the broad ground that when the statutes were enacted they were unconstitutional. Such stat-

ules were in violation of article 9, §§ 1, 3, of the constitution, the material provisions of which are:

"Section 1. All taxes to be raised in this state shall be as nearly equal as may be, and all property on which taxes are to be levied shall have a cash valuation, and be equalized and uniform throughout the state."

"Sec. 3. Laws shall be passed taxing all moneys, credits, investments in bonds, stocks, joint-stock companies, or otherwise, and also all real and personal property, according to its true value in money."

Section 3 also expressly exempts certain property from taxation.

If it be conceded that a commuted system of taxation, whereby a percentage on gross earnings is accepted in lieu of taxation of railway property in specie, might be so adjusted as not to be obnoxious to the constitutional requirement of uniformity and equality of taxation, it is clear that an irrevocable contract, fixing for all future time the rate of taxation on such gross earnings, would not continue to be uniform and equal taxation, because the value of property changes from time to time and the necessities of the state also change, demanding an increased rate of taxation. This is especially true as to town, village, city and county taxes. But uniformity and equality of taxation are not the only mandates of the constitution; for it further commands that all property on which taxes are to be levied (that is, all property not exempt from taxation) shall have a cash valuation, and that laws shall be passed taxing all real and personal property according to its true value in money. The language of the constitution is clear, exact and imperative. It requires that all property not exempt must be taxed, and that the basis of such taxation must be the cash value of the property. As was said by this court in the case of Board of Commissioners of Rice County v. Citizens' National Bank, 23 Minn. 280, 287.

"The leading and controlling purpose of these provisions was to subject all property, of every kind and nature, within the jurisdiction of the state, except such as is specially authorized to be exempted, to taxation upon a basis of a cash valuation, and to secure, so far as practicable, absolute equality and uniformity in the appor-

tionment of taxes, so that every piece of property should bear its just and proportionate share of the public burden in the exact ratio of its cash value to that of the entire taxable property of the state."

It may be true, as claimed, that a gross-earnings tax, if subject to amendment, is only another mode of arriving at equal taxation, and that such a system of commuted taxation of the property of railway companies and similar corporations is of great practical and material advantage to the state; but the fact remains that the taxation of all property upon the basis of its cash value was the sole rule ordained by the constitution to secure equality and uniformity of taxation. Thus, in Stinson v. Smith, 8 Minn. 326 (366), which arose before the amendment to the constitution as to assessments for local improvements, it was held that a statute providing for the assessment of the cost of such improvement upon real estate in proportion to benefits was unconstitutional, because all property on which taxes are to be levied must have a cash valuation. A commuted system of taxation of mining lands, property and products by the payment of a tonnage tax on all ore mined and disposed of, in lieu of all other taxes, was held invalid by this court, because in conflict with article 9, § 1, of the constitution. State v. Lakeside Land Co., 71 Minn. 283, 73 N. W. 970.

There is no decision of this court which holds that statutes of the state providing for the payment of a gross-earnings tax by railway companies, and exempting their property from taxation in specie upon the basis of a cash valuation, were constitutional prior to their ratification by the amendment of 1871, art. 4, § 32a. There is a clear intimation to the contrary in several cases,—notably in those which follow the Parcher case, 14 Minn. 224 (297), sustaining the validity of territorial statutes providing for a gross-earnings tax for the old land-grant railway companies; that is, those which are organized under charters granted prior to the adoption of the constitution.

It is further claimed on behalf of the appellant that the mandates and inhibitions of the constitution as to the taxation of all private property have no application to public lands which passed into private ownership with the privilege of commuted taxation created

with respect to them while they were yet public lands. If this proposition is true, then the legislature, if there are no other constitutional provisions prohibiting it, may provide for exempting from taxation the school lands of the state after their sale, and after they have become absolutely private property, or provide that the owners thereof may forever pay a percentage on the gross or net income derived therefrom, in lieu of all other taxes. The mandate of the constitution applies to all property which is the subject of private ownership, without reference to the source of its acquisition. It would be a palpable evasion of the constitution to permit the legislature to absolutely transfer public lands to private owners, vested with privileges and immunities as to taxation which are prohibited by the constitution.

We hold that the statutes under which it is claimed that the lands in question are exempt from taxation in the ordinary way, upon the basis of their cash valuation, were unconstitutional when enacted, and remained so until validated by the constitutional amendment of 1871. The legal effect of such amendment was to validate them. State v. Luther, 56 Minn. 156, 57 N. W. 464. But this ratification or validation of the statutes was a qualified one, and the right to repeal or amend them was reserved by necessary implication, provided such repeal or amendment was adopted and ratified by a majority of the electors.

Our conclusion is that Laws 1895, c. 168, does not impair the obligation of any contract between the state and railway companies, and that the lands here in question are taxable in the ordinary way, as other lands are taxable.

Judgment affirmed.