STATE v. GREAT NORTHERN RAILWAY COMPANY.[1]

December 24, 1908.

Nos. 15,994, 15,996—(27, 28).

**Increase in Gross Earnings Tax Constitutional.**

Chapter 253, Laws 1903, approved at the general election of 1904, as provided by section 32a of article 4 of the state constitution, increasing the rate of the gross earnings tax of railroad companies doing business in this state to four per cent., is valid as to defendant and all its lines of road and branches thereof. The statute impairs no contractual or other vested right of defendant, and is not repugnant to either the state or the federal constitution.

**Cases Distinguished.**

First Division St. Paul & P. R. Co. v. Parcher, 14 Minn. 224 (297), and other similar cases, distinguished.

Action in the district court for Ramsey county to recover $120,-737.38, the unpaid balance of the tax upon the gross earnings of defendant company for the year 1905, computed at four per cent. Defendant in its answer alleged that its line from St. Paul to Breckenridge, formerly known as the Main Line, and its line from East Minneapolis (formerly St. Anthony) to St. Vincent, (of which that part from St. Anthony to Watab [East St. Cloud] was formerly known as the Branch Line and that from East St. Cloud to St. Vincent was

1 Reported in 119 N. W. 202.

formerly known as the Extension Line or St. Vincent Extension, and all operated under a lease from the St. Paul, Minneapolis & Manitoba Railway Company,) were built and have always been operated by virtue of the provisions of the charter of the Minnesota & Pacific Railroad Company and the acts amendatory thereof; that by virtue of section 18 of the act of May 22, 1857, it was provided the last named company should be exempt from all assessments and taxes whatever upon the payment of three per cent. of its gross earnings; that by virtue of various enumerated mortgage foreclosure proceedings and purchases at foreclosure sales and of chapter 30, Laws of 1876, and chapter 49, Laws of 1879, the Manitoba Company became invested in respect of each of the lines purchased "with all and singular the franchises, rights, powers, privileges and immunities theretofore granted to or possessed by the corporation making such mortgage or deed of trust" to the same extent as if the same had been originally conferred upon such purchaser, and still possessed the same contract rights which were theretofore possessed by the Minnesota & Pacific Railroad Company, the St. Paul & Pacific Railroad Company and the First Division of St. Paul & Pacific Railroad Company in respect to the payment of three per cent. of gross earnings in lieu of all other taxes under the contract whose terms are stated in the act of May 22, 1857. It further alleged that it had paid on said leased lines of road the amount of the three per cent. tax on their gross earnings for the year 1905 as required by the act of May 22, 1857. It alleged that the amount claimed was one per cent. of their gross earnings and was claimed solely by virtue of Laws 1903, chapter 253, and that the act was void as to defendant in that it impaired the obligation of the contract contained in the act of May 22, 1857, and so violated section ten of article one of the federal constitution and section eleven of article one of the Minnesota constitution.

The case was submitted upon stipulated facts. The court, Olin B. Lewis, J., found that since June, 1879, the Manitoba Company had constructed, acquired and leased sixteen branch lines of road and that plaintiff was entitled to judgment in an amount equal to one per cent. of the gross earnings for the year 1905 of the several branches enumerated. It was then stipulated that on the findings the amount

to which plaintiff was entitled was $32,285.94. From a judgment entered pursuant to the order, both plaintiff and defendant appealed. Affirmed as to defendant's appeal, reversed as to state's appeal and judgment ordered in favor of the state for the amount claimed in the complaint.

*Edward T. Young,* Attorney General, *George W. Peterson,* Assistant Attorney General, and *O'Brien & Stone,* for plaintiff.

Even though it is now a contract, the three per cent. gross earnings tax provision of the Minnesota & Pacific charter applies only to the lines expressly authorized thereby. The so-called Branch Line was never extended beyond Watab (East St. Cloud) under the original charter. The extension, when it was made, did not go via Crow Wing, but via Sauk Center, Fergus Falls and Barnesville to St. Vincent, and was constructed under the authority of a state law, approved March 6, 1869. Therefore, the original charter authority, and the accompanying gross earnings tax provision, if the latter is to be considered as a contract applicable to any of the lines, must be restricted to the old Main Line from St. Paul to Breckenridge, and to the Branch Line from East Minneapolis to East St. Cloud. As to any lines not constructed under the original charter, but authorized by subsequent laws, and taxed upon the gross earnings basis, as all of them have been, the defendant must depend upon laws of the state, and not upon the charter of 1857, for authority for the gross earnings system of taxation. All such state laws were, at the time of their enactment, invalid, because unconstitutional, and remained so until the validation thereof by the constitutional amendment of 1871 (art. 4, § 32a).

This ratification of the gross earnings laws was accompanied by a reservation of the power to amend. State v. Luther, 56 Minn. 156; State v. Stearns, 72 Minn. 200; State v. Duluth & I. R. R. Co., 77 Minn. 433. An exemption from taxation contained in a railroad charter does not apply to extensions authorized by subsequent laws. Southwestern R. Co. v. Wright, 116 U. S. 231; Wilmington & W. R. Co. v. Alsbrook, 146 U. S. 279; Chicago, B. & K. C. R. Co. v. Guffey, 120 U. S. 569; Baltimore v. Mayor, 89 Md. 89. Prior to 1871 the state did not have the power, possessed by the

106 M.—20

territory, of creating a commuted system of taxation. Not having the power to create, it could not extend or enlarge such a system.

Section 18 of the act of May 22, 1857, establishing the straight three per cent. gross earnings tax, was repealed and superseded by the third proviso of section 1 of the act of March 2, 1865, establishing the graduated tax of one, two and three per cent. By the acceptance of this law by both the St. Paul & Pacific and the First Division of the St. Paul & Pacific, the old contract, if it was a contract, was abandoned and a new one entered into, which is subject to amendment. It will be urged that act was unconstitutional and therefore that it could not have the effect of repealing the act of 1857. This is a non sequitur for two reasons: First, the repealing act was validated by the constitutional amendment in 1871; second, the company was paying and the state receiving taxes under this law, at the rate of two per cent. in 1871, when the constitution was amended. It was the law which then governed them and necessarily the law upon which the amendment operated with its validating force. The distinctive feature of the newer law, the graduated tax, was apparent until and including 1875. It was over four years after the amendment before the St. Paul & Pacific and First Division Companies ceased paying the two per cent. permitted by the act of March 2, 1865. Chicago, M. & St. P. Ry. Co. v. Pfaender, 23 Minn. 217.

The three per cent. gross earnings tax provision of the Minnesota & Pacific charter, considered as an irrepealable contract, was personal to that company, and could not be transferred to any other corporation, "save by a specific enabling law couched in explicit language apt to the purpose," and the constitution deprived the state of the power to make such a law. There is nothing in the charters of the St. Paul & Pacific Company, the First Division Company or the Manitoba Company which would authorize the transfer of the tax exemption even if any of those companies had lawfully received the same. See 60 L. R. A. note on page 99, and authorities cited.

Even though the three per cent. gross earnings tax privilege, as an irrepealable contract, was appurtenant to the road, it could not pass to the Manitoba Company, which was legally incapable of re-

ceiving it. The Manitoba Company was organized under the general laws of this state in 1879. It could get only the franchises and privileges which its creator was then competent and willing to give to it. The state could not give it an irrepealable contract right to a special form of taxation. Certainly no private corporation could confer what the state, by its constitution, was prohibited from giving.

Franchises and similar privileges or immunities can never be conveyed by the unaided act of the corporation owning them. They can be received only from the sovereign and when they are transferred, nominally from one corporation to another, which can be done only by sovereign permission, they are really, and as a matter of legal fact, surrendered to the sovereign by the grantor and by it regranted to the grantee corporation. Lauman v. Lebanon, 30 Pa. St. 42. See 60 L. R. A. 53, et seq.; Trask v. Maguire, 85 U. S. 391; Louisville & N. R. Co. v. Palmes, 109 U. S. 244; Keokuk & W. R. Co. v. Missouri, 152 U. S. 301. After an amendment of a state constitution prohibiting exemptions from taxation, no new corporation is capable of receiving and enjoying old exemptions of this character. Bloxham v. Florida, 35 Fla. 625; Mercantile Bank v. Tennessee, 161 U. S. 161; Dow v. Beidelman, 125 U. S. 680; Wellman v. Chicago, 83 Mich. 592; Memphis & L. R. Co. v. Railroad Com., 112 U. S. 609; Yazoo & M. V. R. Co. v. Adams, 180 U. S. 1; Rochester Ry. Co. v. City of Rochester, 205 U. S. 236; Yazoo & M. V. R. Co. v. Adams, 181 U. S. 580.

If there ever was a contract right to the three per cent. gross earnings tax and the accompanying exemption, it was lost by the extension of the road into other states, and by the consolidation with the Eastern Minnesota lines in the Great Northern system in 1902. The impossibility of segregating earnings within the state from those without the state, the extension of the lines into other states, finally resulting in a transcontinental system, have incapacitated the defendant from complying with the terms of the charter of 1857. For that reason, the alleged exemption has disappeared. Chapter 18 of the law of 1857, which is now claimed to constitute the contract, made no reference to interstate earnings or to an apportionment of any part thereof to Minnesota. It obligated the company to pay

three per cent. upon all its earnings of whatever nature. The idea of apportioning earnings from interstate traffic did not arise until later, and for many years now it has been a part of the statute law of this state, the method of accounting for such earnings being expressly fixed by acts of the legislature. In view of these later laws expressly providing for such an apportionment, we submit that the acts of the state officers cannot now be claimed to amount to a practical construction of the law of 1857. Maine Central R. Co. v. Maine, 96 U. S. 499.

The case of State v. Stearns, 72 Minn. 200 (1898) was the first case in which the question of an irrepealable contract right in the gross earnings tax law was presented. The claim was denied by this court, and, although its decision was reversed, the supreme court of the United States did not hold that there was an irrepealable contract. Stearns v. Minnesota, 179 U. S. 223. The Minnesota cases are in a class by themselves. 12 Am. & Eng. Enc. (2d Ed.) 298, 299. If there is any substantial doubt as to the existence of the alleged right, the decision must be in favor of the state. See Stearns Case, 72 Minn. 220, 221; Phœnix F. & M. Ins. Co. v. Tennessee, 161 U. S. 174; Chicago, B. & K. C. R. Co. v. Guffey, 120 U. S. 569; Picard v. East Tennessee V. & G. R. Co., 130 U. S. 637.

*William R. Begg,* for defendant.

The act of May 22, 1857, and its acceptance created an irrepealable contract as to the taxation of the railroads and branches which might be constructed under authority of the franchises thereby granted. The legislature of the territory was competent to make a valid contract. Section 1 of the schedule to the constitution preserved and continued this contract. First Division St. P. & P. R. Co. v. Parcher, 14 Minn. 224, 249 (297) ; State v. Winona & St. P. R. Co., 21 Minn. 315, 317; City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469, 474; County of Stevens v. St. Paul, M. & M. R. Co., 36 Minn. 467, 471; Powers v. Detroit G. H. & M. R. Co., 201 U. S. 543, 556; Humphrey v. Pegues, 16 Wall. 244.

After the passage and acceptance of the acts of March 2 and March 4, 1865, the contract as to taxation of the railroad and branches constructed and to be constructed under authority of the act of

1857, continued in full force and effect, modified only as to the time when the obligation to pay taxes would arise and as to the rate at which gross earnings tax should be paid. The legislature of the state had power to make a valid and irrepealable contract modifying the provisions as to taxation of the act of 1857. State v. Winona & St. P. R. Co., supra; Chicago, M. & St. P. R. Co. v. Pfaender, 23 Minn. 217, 221; City of St. Paul v. St. Paul & S. C. R. Co., supra, at page 474; State v. Northern Pacific R. Co., 36 Minn. 207; County of Stevens v. St. Paul, M. & M. Ry. Co., supra, at page 472; County of Traverse v. St. Paul, M. & M. Ry. Co., 73 Minn. 417, 425; State v. Commissioner, 37 N. J. L. 240, 248.

The constitutional amendment of 1871 (art. 4, § 32a) is a restriction upon the power of the legislature to amend or repeal any gross earnings tax law that has already been enacted or that may be enacted.

It is only laws providing for the repeal or amendment of gross earnings tax laws which must be submitted to a vote of the people. The object of the constitutional provision was to prevent any decrease in the rate of tax or any change in the method applicable to any company without the consent of the people. After the passage of the amendment, the legislature assumed that it had authority to enact gross earnings tax laws without submitting the same to the people. Chapter 111, Sp. Laws 1873, which in section 1 provided for the payment of a gross earnings tax in lieu of other taxes by the St. Paul, Stillwater & Taylor's Falls Railroad Company and in section 2 provided that any railroad company might accept its terms and pay gross earnings tax in accordance therewith, was never submitted to a vote of the people. Chapter 11, Laws of 1887, which provided that all railway companies, whether they have accepted the law of 1873 or not, must pay gross earnings tax in accordance with that law was never submitted to the people. Nevertheless for eighteen years the railroads, other than those whose charters specially provided for a gross earnings tax, paid taxes in accordance with this general law. This was done without question as to the validity of the law either on the part of the state or the railroads. In 1889 the legislature enacted a law defining the meaning of the word "gross earnings". This law was not submitted to the people.

It necessarily follows from the decision in State v. Stearns, supra, that chapter 111, Sp. Laws 1873, chapter 11, Laws of 1887, and the 1889 law relating to gross earnings, were void because they were not submitted to the people. And yet the state, through its various departments, continued to insist that the railroads pay, and the railroads did pay, gross earnings taxes under these laws down to and including the year 1904. No attempt was made either by legislation or otherwise to refund taxes which had been collected under these void laws and to collect taxes under the general law, or by any special method. The state treated these laws as valid and effectual.

If the acts of March, 1865, and their acceptance did not create a valid and irrepealable contract, modifying the original contract as to taxation, then the original contract remains in full force. County of Stevens v. St. Paul, M. & M. Ry. Co., supra, at page 471; State v. Commissioner, supra, at page 248.

The contract provision as to taxation covers taxation both of the railroads and the granted lands. Section 18 of the act of 1857, as amended by the acts of 1865, constitute one indivisible and inseparable provision for a gross earnings tax in lieu of all other taxes and assessments upon the railroads, railroad property and granted lands of the company entitled to the benefits of those acts. The gross earnings tax constitutes the payment of taxes both upon the railroad, the land grant and all the other property of the company used for railroad purposes and also upon all its capital stock, whether in the hands of the company or the public. State v. Luther, 56 Minn. 156, 162; County of Traverse v. St. Paul, M. & M. Ry. Co., supra, at page 425.

The contract provision as to taxation of the railroads and granted lands created by the act of 1857, as amended by the acts of 1865, was not a mere privilege personal to the Minnesota & Pacific Company or the St. Paul & Pacific Company, but was an appurtenant to the railroads and lands and passed with the railroads and lands to any successor in interest. Huff v. Winona & St. P. R. Co., 11 Minn. 114 (180); First Division St. P. & P. R. Co. v. Parcher, supra; State v. Winona & St. P. R. Co., supra; First Division St. P. & P. R. Co. v. City of St. Paul, 21 Minn. 526; Chicago, M. &

St. P. R. Co. v. Pfaender, supra; City of St. Paul v. St. Paul & S. C. R. Co., supra; County of Nobles v. Sioux City & St. P. R. Co., 26 Minn. 294; State v. St. Paul, M. & M. R. Co., 30 Minn. 311; State v. Northern Pacific R. Co., 32 Minn. 294; County of Hennepin v. St. Paul, M. & M. R. Co., 33 Minn. 534; County of Ramsey v. Chicago, M. & St. P. R. Co., 33 Minn. 537; County of Stevens v. St. Paul, M. & M. R. Co., supra; County of Traverse v. St. Paul, M. & M. R. Co., supra; Minneapolis & St. L. R. Co. v. Koerner, 85 Minn. 149; State v. Northern Pacific Ry. Co., 36 Minn. 207; County of Todd v. St. Paul, M. & M. R. Co., 38 Minn. 163.

In every case in which a state court has held the contract as to taxation transferable with the property to which it relates, the supreme court of the United States has followed the decision of the state court. See Stearns v. Minnesota, 179 U. S. 223, 253, 254.

As to the effect of the long continued practical construction of a constitution or statute see: Carson v. Smith, 5 Minn. 58 (87); Loring v. Benedict, 15 Minn. 153 (198); City of Faribault v. Misener, 20 Minn. 347 (396); Ames v. Lake Superior & M. R. Co., 21 Minn. 241; Green v. Knife Falls B. Corp., 35 Minn. 155, 161; Willis v. Mabon, 48 Minn. 140; State v. Moffett, 64 Minn. 292; State v. Northern Pacific R. Co., 95 Minn. 43; State v. Evans, 99 Minn. 220; McCulloch v. Maryland, 4 Wheat. 316; U. S. v. Moore, 95 U. S. 760, 763; U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 341; Brown v. U. S., 113 U. S. 568, 570; U. S. v. Hill, 120 U. S. 169, 180; Knowlton v. Moore, 178 U. S. 41; People v. Dayton, 55 N. Y. 367; Com. v. Gregory, 121 Ky. 256.

The contract as to taxation created by the act of 1857, and subsequent acts, and the appurtenant thereby created, attaches to and controls the taxation of all the lines acquired and owned by the Manitoba Company within the state. The line from St. Paul to Breckenridge was constructed without change of location. That part of the line from St. Anthony via St. Cloud and Crow Wing to St. Vincent between St. Cloud and St. Vincent was relocated so as to pass through Alexandria instead of through Crow Wing. This change of location was expressly authorized by section 6 of the act of February 6, 1864. The legislature had power to authorize the change

in the route of the Extension Line from St. Cloud to St. Vincent. In fact the change of location was within the meaning of section 2 of the act of 1857. The lines named in section 2 of that act are clearly within the contract.

The lines other than the Main, Branch and Extension lines are also within the contract as to taxation. The grant by congress is specific and is granted only for the purpose of aiding in the construction of the roads named in section 2 of the act of 1857. Why, then, should the legislature of the territory make its grant upon condition that the lands be applied to the construction only of these roads? The condition was imposed solely for the reason that the legislature of the territory realized that the act of 1857, contemplated the construction of lines other than those named in section 2. Sections 2, 7, 13, 16, plainly contemplate the construction, acquisition, maintenance and operation by the company of lines of railway other than those named in section 2, which shall be branches or extensions of those lines. Even if the branch lines named in the court's findings of fact were not originally within the scope of the act of 1857, they were subsequently brought within the scope of that act by special enactments of the legislature authorizing the construction of such branch lines. The rule of law as established at the time these special acts were passed entered into and became a part of the contracts created by those acts, so that the branch lines were brought within the contract provision of the original charter relating to taxation of the lines.

Section 18 of the act of 1857, as amended by the acts of 1865, does not grant an immunity from taxation. It merely provides for a commuted tax. County of Hennepin v. St. Paul, M. & M. R. Co., supra; County of Ramsey v. Chicago, M. & St. P. R. Co., supra; County of Todd v. St. Paul, M. & M. R. Co., supra; City of St. Paul v. St. Paul, M. & M. R. Co., 39 Minn. 112, 113; State v. Luther, supra, at page 160; State v. Northern Pacific R. Co., 32 Minn. 294; County of Traverse v. St. Paul, M. & M. R. Co., supra, at page 425; Minneapolis & St. L. R. Co. v. Koerner, 85 Minn. 149, 150; City of St. Paul v. St. Paul & S. C. R. Co., supra, at page 471.

As section 18 does not create an exemption from taxation, the rule of strict construction does not apply. It is therefore the duty of the court to construe the provisions of the act of 1857, and amendatory acts, in accordance with ordinary rules applicable to the construction of contracts. The cardinal rule of construction is that where the language of a contract or statute is clear there is no room for construction. Lake County v. Rollins, 130 U. S. 662, 670; Doe v. Considine, 6 Wall. 458, 479; Wilkinson v. Leland, 2 Pet. 627, 662; U. S. v. Fisher, 2 Cranch, 358, 399; U. S. v. Wiltberger, 5 Wheat. 76, 95; Pennington v. Coxe, 2 Cranch, 33, 52; Thornley v. U. S., 113 U. S. 310, 313; City v. Virginia, 76 Ill. 34, 40; Hills v. Chicago, 60 Ill. 86, 90, 91. Another rule of construction is that a statute or contract must be so construed as to give effect to every word and clause of it. Platt v. Union Pacific R. Co., 99 U. S. 48, 58; Market Co. v. Hoffman, 101 U. S. 112, 115; Crozer v. People, 206 Ill. 464; Perteet v. People, 65 Ill. 230, 233.

The foregoing contentions of the Great Northern Railway Company are res adjudicata. See Parcher case, County of Stevens case and Traverse County case.

But assuming that the judgments in the Parcher, County of Stevens and County of Traverse cases are not judgments in rem, but are judgments merely in personam, they are none the less conclusive of the questions involved herein. People v. Beaudry, 91 Cal. 213; People v. Irrigation District, 128 Cal. 477; People v. Holladay, 93 Cal. 241; Chicago v. Racine, 123 Wis. 102; Georgia R. & Banking Co. v. Wright, 132 Fed. 912, 915; Baltimore, C. & A. R. Co. v. County, 93 Md. 113; Grunert v. Spalding, 104 Wis. 193; State v. Kennedy, 60 Neb. 300; Baldwin v. Maryland, 179 U. S. 220, 221; Southern Pacific R. Co. v. U. S., 168 U. S. 1, 48; City of New Orleans v. Bank, 167 U. S. 371, 396; Bank v. City of Frankfort, 191 U. S. 499. It is established by the foregoing cases that where the existence of a given fact or state of facts is an issue in an action or suit before a court which has jurisdiction of the parties and the subject matter, and is actually determined by the judgment therein, that determination is conclusive in all future litigation between the same parties and their privies. In the case at bar the issue is whether the act of 1857, as amended by the acts of 1865, created an

irrepealable contract covering the taxation of the railroads contemplated by the act of 1857, and whether this contract relating to the taxation of the lines has descended to successive purchasers and lessees of these railroads and provides the exclusive method for their taxation. This was the identical issue in each of the three cases above referred to. In each of the cases the issue was determined in favor of defendant's contentions.

The decision of this court as to the nature and effect of the gross earnings tax provision of the act of 1857, and acts amendatory thereof, established a rule of property which entered into and became a part of the contract under which the Manitoba Company purchased and acquired the railways and properties of the St. Paul & Pacific Railroad Company and the First Division Company in 1879, and also became a part of the contract of February 1, 1890, whereby the Manitoba Company leased said railways unto the defendant. Huff v. Winona & St. P. R. Co., 11 Minn. 114 (180); First Division St. P. & P. R. Co. v. Parcher, 14 Minn. 244 (297); State v. Winona & St. P. R. Co., 21 Minn. 315; St. Paul & P. R. Co. v. City of St. Paul, 21 Minn. 526; Chicago, M. & St. P. R. Co. v. Pfaender, 23 Minn. 217; City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469. These cases declare that the provisions of the territorial charters as to taxation of railroads created irrepealable contracts and created property rights appurtenant to the railroads and granted lands, which rights passed with the railroads and lands to subsequent purchasers and lessees. Before the lease of 1890 to the defendant these cases had been reinforced by the following: County of Nobles v. Sioux City & St. P. R. Co., 26 Minn. 294; State v. St. Paul, M. & M. R. Co., 30 Minn. 311; State v. Northern Pacific R. Co., 32 Minn. 294; County of Hennepin v. St. Paul, M. & M. R. Co., 33 Minn. 534; County of Ramsey v. Chicago, M. & St. P. R. Co., 33 Minn. 537; County of Stevens v. St. Paul, M. & M. R. Co., 36 Minn. 457; State v. Northern Pacific R. Co., 36 Minn. 207; County of Todd v. St. Paul, M. & M. R. Co., 38 Minn. 163. This rule of property cannot be changed at this day either by the legislature or the court without impairing the obligation of those contracts and taking property without due process of law.

Accounts of the gross earnings of the several lines of the Manitoba Company have been kept as required by the act of 1857, and acts amendatory thereof. The earnings of each of the several lines of that company for the year named were separately kept and appear in the paper book. The total gross earnings within Minnesota include the entire earnings on each and every item of traffic wholly within the state of Minnesota and a proportion of the earnings on each item of business transacted partly over the lines in Minnesota and partly over the lines without the state equal to the proportion which the mileage over which the item is transacted in Minnesota bears to the total mileage over which it is transacted. The earnings and each item of business which in Minnesota passes partly over the lines of the Eastern partly over the lines of the Manitoba Company are also divided between the lines of the Eastern and the lines of the Manitoba Company on the same basis. The division between the several Manitoba lines is likewise made on a mileage basis in the case of each item of traffic passing over more than one of the Manitoba lines. The earnings on items of traffic which are transacted within Minnesota wholly over the Manitoba lines are all credited to the Manitoba lines and to that particular line to which it is local. The same is done in the case of business transacted wholly over the lines of the Eastern. The method of keeping the account of gross earnings of lines within Minnesota and of dividing between the Minnesota lines and the lines in other states earnings on interstate business is that which has been prescribed and enforced by the Railroad and Warehouse Commission of the state and by the treasurer and other officers of the state; and said officers have at all times insisted that interstate earnings be divided on the basis named, and that the account of the earnings be kept in the manner hereinbefore stated.

The lease from the Manitoba Company to the Great Northern Company is a lease and not a sale. County of Traverse v. St. Paul, M. & M. R. Co., 73 Minn. 417; Morrison v. St. Paul & N. P. R. Co., 63 Minn. 75. But even if it were an absolute sale and transfer no merger would result within the meaning of the contract as to taxation. Chicago, M. & St. P. R. Co. v. Pfaender, supra; State v. St. Paul, M. & M. R. Co., supra, at page 313; State v. Northern

Pacific R. Co., supra, at page 295; State v. St. Paul Union Depot Co., 42 Minn. 142; Minneapolis & St. L. R. Co. v. Koerner, 85 Minn. 149, 150.

Chapter 253 of the laws of 1903 is invalid and unconstitutional as applied to the lines of railway of the Manitoba Company, or any of them. As applied to these lines, that chapter 253 attempts to effect a material change in this contract and to materially diminish the value of this vested property right. It therefore violates the provisions of art. 1, § 11, of the constitution of Minnesota and art. 1, § 10, of the constitution of the United States, which forbid the impairment of· contracts. As applied to the lines of the Manitoba Company it also violates art. 1, § 7, of the constitution of Minnesota and amend. 14, § 1, of the constitution of the United States, in that it attempts to take away a vested property right without any compensation therefor. Laws having such an effect are uniformly held invalid. O'Brien v. Krenz, 36 Minn. 136; Dunn v. Stevens, 62 Minn. 380; Union Bank v. Rugg, 78 Minn. 256; Northwestern Tel. Co. v. City of Minneapolis, 81 Minn. 140; Shell v. Matteson, 81 Minn. 38; Dartmouth College v. Woodward, 4 Wheat. 518; Ohio Ins. & T. Co. v. Debolt, 16 How. 416, 432; Gelpcke v. City of Dubuque, 1 Wall. 175; Humphrey v. Pegues, 16 Wall. 244; Bradley v. Lightcap, 195 U. S. 1, 16; Muhlker v. New York & H. R. Co., 197 U. S. 544.

The constitution of the state adopted on its admission to the Union and after the passage of the act of 1857 could not abrogate or destroy contract rights and authority conferred by that act. The framers of that instrument were not repudiationists, as is evident from section 1 of the schedule to the constitution they framed. No matter what the constitution may contain as to power to create exemptions or to create corporations by special act in the future, the framers of the instrument very carefully preserved rights that had already vested. Section 1 expressly continues, ratifies and makes valid all the provisions of the act of 1857, and this court has so decided. First Division St. P. & P. R. Co. v. Parcher, supra. As intimated in the Parcher case, the contract rights conferred by the act of 1857 could no more be infringed by a constitution than by a law. The federal constitution places such contracts beyond the reach of impairment either by state constitutions or state laws.

BROWN, J.

This action involves the validity of chapter 253, p. 375, Laws 1903, approved by the people at the general election of 1904, as provided for by article 4, § 32a, of the state constitution, increasing the gross earnings tax upon railroad companies of the state to four per cent. Though the facts and various statutes bearing upon the case, and which control its determination, have been stated and referred to in prior opinions, a restatement is necessary to an understanding of the present opinion.

By an act approved March 3, 1857 (11 St. 195, c. 99), congress granted to the territory of Minnesota certain public lands to aid in the construction of railroads therein. Edgerton, R. R. Laws, 82. The act particularly defined the terms of the grant, and expressly provided that the lands thereby granted were subject to the future disposal of the territory or state for the purposes therein expressed, and no other. This, when accepted, created a trust which the territory or future state was bound to carry out in form and spirit as directed by the terms of the grant. For this purpose the territorial legislature, by chapter 1, Laws 1857, Ex. Sess., in effect accepted the grant and provided for the incorporation of the Minnesota & Pacific Railroad Company, and conferred upon it and its successors authority to construct and operate certain lines of railroad within the territory, including specified branches, and providing for the conveyance to the company of the lands granted by congress, substantially upon the terms and conditions imposed by the act of congress.

This act constituted the charter of the railroad company. Its organization was completed, and the company, after formally accepting the act, commenced the construction of the railroad therein provided for. Lack of capital to prosecute the work necessitated a loan by the company, and it mortgaged by trust deed its line, all its property and franchise privileges, to Elon Farnsworth, and others, to secure the payment of funds thus obtained. This mortgage was executed on July 31, 1858, and was supplemented by a second mortgage to the same parties in November, 1858, securing the payment of bonds issued by the company, a part of which were delivered to the state in exchange for its bonds issued under the constitutional amendment of April 15, 1858, to aid in the construction of the road. Edgerton, R. R. Laws, 3. The

state bonds, to the amount of five million dollars, though the company utterly failed to construct the road and the state in fact received no consideration therefor, the state, after a prolonged contest, by the decision of this court in State v. Young, 29 Minn. 474, 9 N. W. 737, was rightly compelled to pay.

Section 18 (Page 12) of the charter of the Minnesota & Pacific Company contained two distinct provisions upon the subject of taxation, in the language following:

1. "In consideration of the grants, privileges and franchises herein conferred on the said Minnesota & Pacific Railroad Company, the said company shall and will, on or before the first day of March in each year, pay into the treasury of the territory or future state, three per centum of the gross earnings of the said railroad, * * * and in consideration of such annual payments the said company shall be forever exempt from all assessments and taxes whatever by the territory or state which shall succeed the territory, or by any county, city, town, village or other municipal authority in the territory or state upon all stock in the said 'Minnesota and Pacific Railroad Company,' whether belonging to said company or to individuals, and upon all its franchises or estate, real, personal or mixed, held by said company," and

2. "Said land granted by said act of congress hereby authorized to be conveyed to the said Minnesota and Pacific Railroad Company shall be exempt from all taxation till sold and conveyed by said company."

The company did not complete the construction of the lines of road provided for by its charter, and made default in the payment of the Farnsworth mortgage. Whereupon, on June 3, 1860, the mortgage was duly foreclosed by advertisement in the manner and in accordance with its terms and the statutes of the state in such case made and provided, and the railway, properties, franchises, rights, and privileges of the company were purchased by the state for the sum of one thousand dollars, it being the highest and best bidder at the sale. By this purchase the state became vested with all the railroad properties, and, no redemption being made, the company became wholly divested of its rights. In March, 1861, for the purpose of giving the company another opportunity to complete the roads contemplated, the state legislature

by an act approved March 8, 1861,[2] restored to the company all rights lost under the foreclosure upon the terms and conditions specified in the act, one of which was that if the company failed to construct a line of road between St. Paul and St. Anthony before January 1, 1862, all rights under the act should be forfeited to the state without any further act or ceremony on its part. The company failed to comply with the conditions, and in consequence the land grant and all property, rights, privileges, and immunities of the company reverted to and became finally, fully, and absolutely vested in the state.

Thereafter the state legislature by chapter 20, p. 247, Sp. Laws 1862, being an act to facilitate the construction of the Minnesota & Pacific Railroad, and to amend and continue the act incorporating that company, provided for the organization of the St. Paul & Pacific Railroad Company, and thereby granted to that company, and its successors, all rights, privileges, franchises, lands, and property theretofore granted to the Minnesota & Pacific Company and restored to the state by the foreclosure just referred to, and authorized it to construct the lines of road undertaken by the old company. The terms and conditions relating to the construction of the road and the conveyance of lands as the work progressed were in all respects in conformity with the act of congress. That company accepted the act, and proceeded to the performance of the obligations thereby assumed. By chapter 3, p. 174, Sp. Laws 1864, the St. Paul & Pacific Company was authorized to issue one or more classes of preferred stock, and to enter into agreements or contracts with the holders thereof for the administration of the portion of the road to which the stock might pertain, and for the independent organization by such holders to enable them, separately or in conjunction with the general directors of the road, to exercise supervision and control of their separate portion of the road. Under this act preferred stock was duly issued, and the holders thereof, acting under the statute just referred to, organized and incorporated the First Division of the St. Paul & Pacific Railroad Company, which company, through its officers, thereafter co-operated with the St. Paul & Pacific Company in the construction of the road.

The act incorporating the latter-named company contained no ex-

[2] Sp. Laws 1861, p. 235, c. 5.

press reference to the rate or system of taxation to be imposed upon the company, but it is claimed that all the provisions on this subject contained in the old·Minnesota & Pacific Company's charter passed by the terms of the act incorporating it and were included within the designation of "rights, privileges, and immunities." However, by chapter 6, p. 40, Sp. Laws 1865, an act to facilitate the completion of the St. Paul & Pacific Railroad and branches, the legislature imposed a different rate of taxation than that contained in the Minnesota & Pacific Company's charter, in this: That by this act the company was required to pay during the first three years, after thirty miles of its road had been completed, one per cent. of its gross earnings, two per cent. during the succeeding seven years, and thereafter three per cent. The act also contained a provision that the lands of the company should be subject to taxation as soon as sold, leased, or contracted to be sold or leased. The St. Paul & Pacific Company formally accepted this act, and the First Division Company thereafter complied with its terms and provisions by paying the rate of taxation thereby imposed. The organization of the First Division Company was legalized and confirmed by chapter 1, p. 11, Sp. Laws 1866.

Between 1862 and 1871, both these companies separately executed trust deeds and mortgages covering the main line of the road and all its branches according to the ownership of the same by the separate companies, thereby conveying to the mortgagees or trustees all property, rights, privileges, franchises, and immunities held, owned, or possessed by either company. Both companies made default in the payment of the indebtedness secured by these instruments, and they were duly foreclosed in the manner prescribed by law, John S. Barnes, for himself and associates, being the purchaser at the sale made under the foreclosure as to the branch line. Thereafter Barnes and his associates incorporated under the laws of the state the St. Paul, Minneapolis & Manitoba Railroad Company, and to this company they conveyed all rights acquired under the foreclosure stated. Thereafter the mortgage on the main line was foreclosed and the Manitoba Company became the purchaser. By these foreclosures the Manitoba Company became the sole owner of all rights, privileges, and property of the two other companies. The Manitoba Company leased its line, together with all property rights, franchises, privileges, and immunities, to the defendant

Great Northern Company, incorporated under the laws of the state, for the term of nine hundred ninety nine years.

The old Pacific and the First Division Companies paid taxes to the state upon the basis of the act of 1865, already referred to, viz., one per cent. for the first three years after the completion of thirty miles of road, two per cent. for the succeeding seven years, and thereafter, and until their rights passed from them by the foreclosure proceedings just referred to, at the rate of three per cent. of their gross earnings. The Manitoba Company paid this rate at all times during its ownership and operation of the road. In 1871 there was duly incorporated into the constitution of the state a provision to the effect that no statute theretofore enacted or thereafter to be enacted imposing a gross earnings tax upon the railroad companies should be repealed or amended except upon a submission of the proposition to a vote of the people. Section 32a, art. 4, Const. (Minn.) Acting under this mandate, the legislature, by the statute made the basis of this action, amended the gross earnings tax statutes theretofore enacted by raising the rate to four per cent. This applied to and made a uniform rate for all railroads of the state (State v. Duluth & N. M. Ry. Co., 102 Minn. 26, 112 N. W. 897), and was submitted to and ratified by the people, and thus became a valid enactment, unless the contention of defendant presently to be mentioned be sustained.

This action was brought to recover the amount of the increased tax, the company having paid the old rate of three per cent. The defense to the action is that the charter provisions of the Minnesota & Pacific Railroad Company imposing upon it a three per cent. rate became, upon acceptance by the company, an irrepealable contract which passed unimpaired, as an appurtenant to the road and its franchises, by and through the various transfers of the rights and privileges of that company to defendant, successor in interest of all prior companies. It is insisted that to enforce the statute in suit would impair the obligations of that contract and destroy and take from defendant a vested property right in violation of both the state and the federal constitutions. It appears from the record that several branches have in the past been constructed in connection with the main line of road, which were not expressly provided for by the original charter of the Minnesota & Pacific Company. As to these the trial court held the increase of the tax

106 M.—21

valid, but invalid as to the lines and branches contemplated by the original charter. Judgment was ordered accordingly, and both parties appealed.

We approach with some embarrassment the consideration of the questions presented, owing to the expressions found in prior opinions in cases involving railroad taxation, which seem to, and which defendant's counsel earnestly insist, fully determine the questions involved in the present case adversely to the contention of the state. But in view of the fact, which will be demonstrated further along in the opinion, that the question here presented, viz., whether the provisions of the Minnesota & Pacific Company's charter on the subject of the earnings tax constituted an irrevocable contract, was not involved in any prior litigation between the state and the railroad company, and what was said in the previous cases bearing upon the question was wholly unnecessary to the decision of the particular case, and therefore not of binding force or effect, we take up and dispose of the present case as though the question were, as it is, here for the first time. Whatever doubts the previous decisions may have created upon the subject are all cleared up by a close analysis of the precise issues there presented.

1. The right of a state government through its legislature, when not restricted by constitutional provisions, by contract to limit its power of taxation, is a doctrine too firmly established to admit of discussion at this time. It has been affirmed by the highest tribunal in the country, and, though vigorously combated by some able state courts, the question must be deemed for present purposes completely at rest. Oliver v. Memphis, 30 Ark. 128; Day v. City, 167 Mass. 371, 45 N. E. 751; City v. Richmond, 21 Gratt. (Va.) 613; Wilmington Railroad v. Reid, 13 Wall. 264, 20 L. Ed. 568; 12 Am. & Eng. Enc. (2d Ed.) 272. The contract to be irrepealable, however, must clearly and conclusively appear. The power of taxation is a sovereign prerogative; its exercise is indispensable to the maintenance of the state and its institutions, and no inferences or presumptions arising from indefinite and uncertain language that it has relinquished, limited, or abandoned the right as to any particular person or corporation should be indulged by the court in support of an immunity not enjoyed by all taxpayers alike. Therefore the contract is strictly to be construed, and must be in language and terms too clear to admit of doubt. Chicago, B. & K. C. R. Co. v.

Guffey, 120 U. S. 569, 7 Sup. St. 693, 30 L. Ed. 732.; State v. Stearns, 72 Minn. 200, 75 N. W. 210; County of Hennepin v. Bell, 43 Minn. 344, 45 N. W. 615. The rules governing the courts in construing contracts of this kind are tersely stated in a note to Adams v. Yazoo & M. V. Ry. Co., 60 L. R. A. 33, 38: "In construing and interpreting contracts of this class, the courts are guided by a set of principles that have now become fundamental. * * * These, in brief, are, chiefly, that taxation is the rule, and exemption the exception; the power of taxation is an essential attribute of sovereignty, necessary and vital to the very existence of government; the whole community is interested in its maintenance unimpaired; it is presumed never to have been surrendered; and the intention to surrender it must be expressed in language so clear and free from ambiguity as to admit of no reasonable doubt. An exemption never arises by implication; it is always restricted to its lowest possible terms; * * * every doubt must be resolved in favor of the government and against the claimant." A long list of supporting authorities there cited discloses a uniform trend of judicial opinion on the subject.

Under the rule stated, it would seem at least doubtful whether the charter of the Minnesota & Pacific Railroad Company, in so far as pertinent to the subject of gross earnings taxation, constituted an irrepealable contract between the territory and the railroad company which forever bound the territory or future state, not only respecting the method of taxation, but also the rate thereof. Two distinct provisions on the subject of taxation were embodied therein, the first providing for a gross earnings tax in lieu of all other taxes and assessments, and, second, an exemption of the land granted until sold or contracted to be sold by the company. The charter provided on the subject of the earnings tax that, in consideration of the grants, privileges, and franchises therein conferred by the territory, the railroad company should pay annually into the treasury of the territory or future state three per cent. of its gross earnings, in lieu of all other taxes; "and in consideration of such annual payments the said company shall be forever exempt from all assessments and taxes whatever. * * *" It is evident that a mere personal privilege was extended to the company which it might exercise or not at its option. If it failed to pay the earnings tax, the exemption ceased, and the territory could then resort to the usual

method of compelling the company to contribute its share to the public burdens. The charter contains no express language indicating an intention that the company should forever submit to this form of taxation, and if it was not so obligated, then, under the rule requiring mutuality in contractual obligations, the territory was not bound by that system.

In other words, a fair construction of the language of the charter, within the strict rule, would seem to justify the conclusion that the parties intended the earnings system of taxation to continue so long as the company complied with the terms thereof by making the annual payments, and not as an irrevocable contract binding upon both parties for all time. That the right of modification was intended to be reserved to the territory is evidenced by the subsequent legislation and conduct of defendant's predecessors. By chapter 6, p. 40, Sp. Laws 1865, the legislature modified the original charter by providing for the payment of one, two, and three per cent. instead of a uniform rate of three per cent. This act was accepted by the St. Paul & Pacific Company, and acquiesced in by the First Division Company by a compliance with its provisions. By this modification defendant's predecessors received and retained the benefit of an average annual reduction in their taxes of about forty per cent. for the period of ten years. This amounted to a practical construction of the contract, so far as involving the right of the state to change the rate, and if the old companies were here contesting the validity of the present statute, increasing the rate, their denial of the power of the state to so act would come at least with little or no force. While their acquiescence in the prior change would perhaps not be conclusive against them, it furnishes strong evidence that the old charter was not regarded at the time as irrepealable. Defendant, their successor, is in no better position. The right of modification is further evidenced by the amendment to the constitution in 1871, by which it was provided that the system of gross earnings taxation as to railroad companies should not thereafter be changed except by a statute submitted to and approved by the electors.

We are, of course, not to be understood as intimating an opinion that a contract of the tenor and effect of the one claimed could not legally have been entered into by the territory, or that the conduct of the state in subsequently acting thereon and receiving from the railroad com-

pany payment of taxes under the method then adopted was so utterly void as to justify the company in reclaiming the money paid, when, in consideration of its payment, it avoided the property tax, or justify the state in retaining the money and also imposing a property tax. So far as performed or executed by the parties, by the payment and acceptance of the tax, the contract was undoubtedly binding. 29 Am. & Eng. Enc. (2d Ed.) 828. But it is unthinkable that the territorial legislature intended forever, until "doomsday and beyond," thus to preclude the state from applying to this company the same rule that the exigencies of the future might require it to adopt respecting the taxation of like companies in order to secure from them their equitable and ratable share of the necessary public revenues.

2. But, passing this question, upon which we merely express doubts, and conceding for present purposes that the charter provisions constituted an express contract between the territory and the Minnesota & Pacific Company, and that as to that company it was irrepealable, was it personal to the company, or did it become attached as an appurtenant to the charter, rights, franchises, and privileges of the company and pass down the line to defendant? We are of opinion that the question should be answered in the negative.

As a general rule, an exemption from taxation, or the right to a particular form or method of taxation, conferred by law upon a corporation, is a personal privilege, and inalienable by the grantee to another without express legislative authority. The law on the subject is clearly summed up in the case of Morgan v. Louisiana, 93 U. S. 217, 23 L. Ed. 860, where, in the course of a discussion of the subject, the court said: "Much confusion of thought has arisen in this case and in similar cases from attaching a vague and undefined meaning to the term 'franchises.' It is often used as synonymous with rights, privileges, and immunities, though of a personal and temporary character; so that, if any one of these exists, it is loosely termed a 'franchise,' and is supposed to pass upon a transfer of the franchises of the company. But the term must always be considered in connection with the corporation or property to which it is alleged to appertain. The franchises of a railroad corporation are rights or privileges which are essential to the operations of the corporation, and without which its road and works would be of little value; such as the franchise to run cars, to

take tolls, to appropriate earth and gravel for the bed of its road, or water for its engines, and the like. They are positive rights or privileges, without the possession of which the road of the company could not be successfully worked. Immunity from taxation is not one of them. The former may be conveyed to a purchaser of the road as part of the property of the company; the latter is personal and incapable of transfer without express statutory direction." See, also, authorities cited in 60 L. R. A. 33, and 35 Am. St. 390.

We have no statute in this state, nor did any exist in territorial days, authorizing, directly or indirectly, the mortgaging, sale or other transfer of an exemption of this sort. The charter of the Minnesota & Pacific Company contained no such provisions, nor any language which, by implication, would justify the conclusion that a sale, mortgaging, or other transfer of the privilege was authorized or even contemplated. The exemption does not pass as an appurtenant to railroad properties, and is not included within the expression "rights, privileges and immunities." Gulf & S. I. R. Co. v. Hewes, 183 U. S. 66, 22 Sup. Ct. 26, 46 L. Ed. 86; Chesapeake & O. Ry. Co. v. Miller, 114 U. S. 176, 5 Sup. Ct. 813, 29 L. Ed. 121; Lake Drummond v. Com., 103 Va. 337, 49 S. E. 506, 68 L. R. A. 92; City v. Rochester, 182 N. Y. 99, 74 N. E. 953, 70 L. R. A. 773; Covington & L. Turnpike Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560. A distinction must not be overlooked, when considering the assignability of a tax exemption, between those imposing a commuted system in lieu of property taxes and those exempting specific property. In the former case the system does not attach to the corporation or concern thus taxed nor to any particular property, and necessarily is personal and not assignable. But where, as in the case at bar, specific land is granted to a railroad company to aid in the construction of a railroad, and is specifically exempted from taxation until sold by the company, and the company accepts in consideration of the exemption, the exemption attaches to and follows the land. State of New Jersey v. Wilson, 7 Cranch, 164, 3 L. Ed. 303; State v. Hicks, 9 Yerg. (Tenn.) 486, 30 Am. Dec. 423; International v. State, 75 Tex. 356, 12 S. W. 685. In such case, as we have frequently held, as will be shown later, the exemption is appurtenant to and passes with the land to a succeeding corporation assuming the burden attached to it.

It is an elementary rule of uniform application that rights or things in action which do not survive to an executor or administrator are not assignable. An exemption from taxation comes within the rule. And though such a right or immunity might be made assignable by the express terms of the grant creating it, the language of the grant under consideration does not, either expressly or impliedly, provide therefor. The exemption was by the terms of the charter extended to the Minnesota & Pacific Railroad Company, and not to it "and its successors and assigns." City v. Rochester, 182 N. Y. 99, 74 N. E. 953, 70 L. R. A. 773.

Nor is an exemption a property right, or in any proper view analogous to the grant of the right to construct and operate a railroad or to lay gas or water mains in a public street. Such franchises may be classified as property or property rights, and are transferable without express authority from the granting power. Speaking upon this subject, the court of appeals of New York, in the case last cited, [page 118] said: "We have frequently held that, in the absence of express statutory direction, or of an equivalent implication by necessary construction, provisions in restriction of the right of the state to tax the property or to regulate the affairs of its corporations do not pass to new corporations succeeding, by consolidation or by purchase under foreclosure, to the property and ordinary franchise of the first grantee. * * * This we have stated to be a salutary rule of interpretation, founded upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and, therefore, not to be extended beyond the exact and express requirements of the grant construed strictissimi juris. That privilege is not at all similar to such franchises as the right to construct and operate a railroad, to lay gas mains and supply gas, and to maintain a ferry. Those franchises when granted become property similar in their general attributes to other property. The grant of such a franchise, even without consideration, is, unless a right to revoke is reserved, as effectual to vest an indefeasible title in the grantee as a voluntary conveyance of a piece of land. Not so, however, as to an exemption from taxation or from the exercise of the police power. It is property only when granted on a consideration and, if granted without consideration may be recalled. * * * Doubtless such exemptions if attached to

property itself would increase its value, but because they are against common right they will be construed to be personal and limited to the grantee unless a contrary intention clearly appears." See also Memphis & L. R. R. Co. v. Railroad Commissioners, 112 U. S. 609, 28 L. Ed. 837; Gulf & S. I. R. Co. v. Hewes, 183 U. S. 66, 22 Sup. Ct. 26, 46 L. Ed. 86; Memphis v. Phoenix, 91 Tenn. 566, 19 S. W. 1044; Home Ins. & Trust Co. v. Tennessee, 161 U. S. 198, 200, 16 Sup. Ct. 476, 40 L. Ed. 670; Nashville v. Com., 97 Ky. 162, 30 S. W. 200; Arkansas v. Berry, 44 Ark. 17; an extended note in 35 Am. St. 390; 12 Am. & Eng. Enc. (2d Ed.) 298, and cases cited.

3. But there is still another and stronger reason why an irrevocable contract right did not pass to the companies succeeding to the rights of the Minnesota Company. The contract, whatever may be its interpretation as between the territory and the original company, was entered into in 1857. Thereafter, in May, 1858, the territory was admitted to the Union as a state. The foreclosure of the Minnesota & Pacific mortgage, from and through which the alleged immunity came, if at all, to defendant, occurred after the state was so admitted. Without stopping to consider the question whether there was a complete merger of the territorial exemption when the state became the purchaser and owner of the property, rights, and privileges of the company at the foreclosure sale, in so far as that exemption related to the earnings tax, treating it, as we must, independently of the land grant exemption, the further question whether the state could then grant a special privilege of this kind is answered in the negative by the positive terms of the constitution on the subject of taxation. The constitution then expressly provided (section 1, art. 9), that "all taxes to be raised in this state shall be as nearly equal as may be, and all property on which taxes are to be levied shall have a cash valuation and be equalized and uniform throughout the state." The following section specifically limited the right of exemption, and did not include exemptions of the character here involved, nor authorize an earnings tax in lieu of all other taxes. This clearly precluded the state legislature from providing this form of taxation by the revival of an old grant or otherwise, or from extending to any person or corporation an exemption from general taxation in consideration of the payment of an earnings tax. Nor could it create a corporation with the right to receive or hold

a special privilege of this sort. This would seem too clear under the authorities to admit of serious argument.

It is supported, not only on principle, but by courts of high standing. Trask v. Maguire, 18 Wall. 391, 405, 409, 21 L. Ed. 938. In that case the court, in the course of the opinion, said: "The act under which the sale was made provided that the purchasers of the road should have all the rights, franchises, privileges, and immunities, which were enjoyed by the defaulting company under its charter and laws amendatory thereof, subject to the limitations and conditions therein contained, and not inconsistent with the act authorizing the sale. The new company thus acquired all the immunity from taxation which the original company had possessed, if it were competent for the legislature at the time, under the new constitution, to confer this privilege. The question, therefore, is, whether the legislature was competent to grant the immunity claimed, under that constitution, which went into operation on the fourth of July, 1865, previous to the passage of any of the acts authorizing the proceedings under which the new company acquired its rights. * * * The inhibition of the constitution applies in all its force against the renewal of an exemption equally as against its original creation; and this inhibition the legislature could not disregard in providing for the sale of the property which it had purchased."

In Keokuk Ry. Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450, the court in the following language reiterated the same doctrine: "But the decisive answer to this objection is that the legislature had no power, in 1869, to extend to a new corporation, created by the consolidation, an exemption contained in an act passed in 1857 (Laws 1857, Ex. Sess., p. 4, c. 1, § 18), before the constitution was adopted, and hence that, under the terms of this act, we cannot hold that immunity from taxation passed as a franchise or privilege to the consolidated corporation. The construction claimed by the defendant would be directly in the teeth of the constitutional provision that no property shall be exempted from taxation. While, as heretofore observed, an exemption from taxation contained in a charter previously granted could not be taken away by this constitutional provision without the impairment of the obligation of a contract, it doubtless applies to all corporations thereafter formed either by original charter or by the consolidation of prior corporations under the act of 1869." It was

reaffirmed in Rochester Ry. Co. v. City of Rochester, 205 U. S. 236, 27 Sup. Ct. 469, 51 L. Ed. 784, and again in Yazoo & M. V. R. Co. v. City of Vicksburg, 209 U. S. 358, 28 Sup. Ct. 510, 52 L. Ed. 833.

We are speaking now of the earnings system of taxation inaugurated by the Minnesota & Pacific charter, and not with reference to the specific exemption of the land grant. For, as already pointed out, the provisions of the charter on the subject of the earnings tax and those in reference to the land grant exemption are separate and independent. As to the latter, the exemption, being as to specific property delivered to the railroad company for a special purpose which would have been practically valueless without the exemption (County of Nobles v. Sioux . City & St. P. R. Co., 26 Minn. 294, 3 N. W. 701), and received by the company in consideration, in part at least, of the exemption, was an exemption of the land and not of the corporation.

It follows, therefore, that an irrevocable right to the gross earnings system of taxation at an unchangeable rate did not pass from the state when it conferred upon the immediate successors of the original company all "the property, rights, privileges, franchises and immunities" of that company which it acquired on the foreclosure. Nor was one created by the acts of the state legislature in 1865 by which the original charter provisions on the subject were modified. Chapters 6 and 9, pp. 40, 47, Sp. Laws 1865. The legislature of the state was prohibited by the express mandate of the constitution from granting such an immunity. All statutes, therefore, by which an attempt was made to confer the immunity upon defendant's predecessors in interest were unconstitutional and void. State v. Stearns, 72 Minn. 200, 75 N. W. 210.

4. There is, however, another feature of the controversy which fully sustains the right of the state to increase the gross earnings tax. About the year 1869 an agitation was commenced on the subject of railroad taxation which has since then almost continuously, in one form or another, been either before the legislature or the courts of the state. This did not, until the act under consideration was passed, involve the gross earnings system or the rate thereof, but was directed to efforts to separate the land grant of this and other land grant roads for the purposes of taxation in addition to the earnings tax. This we held in the Parcher case, supra, and other subsequent cases, could not be done. But the earlier agitation led to the amendment of the constitution in

1871 (Laws 1871, p. 41, c. 18), by which section 32a of article 4 was added to that instrument. That amendment, as held in the Stearns case, supra, in effect validated prior legislation inaugurating this form of taxation as to railroad companies, and all acts conferring the privilege to so discharge their obligations in respect to taxation. But coupled therewith was the reserved right on the part of the state to repeal or amend the same, provided the proposed amendment be ratified by the electors. Upon that amendment to the constitution, then, the validity of which has never been challenged, rests the inauguration of a valid earnings system of railroad taxation in this state; but no irrevocable contract right was thereby granted or became vested in the railroad companies. The power to amend, within reasonable limitations, still remained in the state, under which the act under consideration is valid. It simply increased the rate from three to four per cent., and no claim is made that, if the power of amendment exists, as compared with the rate imposed upon other taxpayers, it is unreasonable or unfair to the railroad companies.

This power of amendment was expressly recognized and affirmed by the supreme court of the United States on a review of the case of State v. Stearns, supra. Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162. Mr. Justice Brewer, speaking for the court with reference to this amendment to our constitution, said: "Confessedly after that amendment there existed a binding contract between the state and the railroad companies, by which the taxes on all their property were to be commuted and discharged on the payment of three per cent. of the gross earnings. If nothing had since occurred that contract, under the decision of the supreme court, would continue exempting lands not used, as well as lands used for railroad purposes, from any other taxation than that which was expressed by three per cent. on the gross earnings of the companies. In other words, so far as the railroad companies are concerned, that constitutional amendment did away with the restrictive features of sections 1 and 3 of article 9 in the state constitution, and permitted and indorsed a peculiar method of taxation of railroad companies. The constitutional amendment of 1871 forbade any change by repeal or amendment of laws respecting the taxation of railroad companies except upon a vote of the people. The converse of that proposition may be accepted, to wit, that by a vote of

the people the tax provision concerning railroads might be repealed or amended. But is there no limitation upon the power of amendment?" The court then proceeded to hold that an amendment which attempted to separate the land grant for the purposes of ordinary taxation, still retaining and enforcing the earnings rate in full, was unreasonable, saying that "a contractual exemption of the property of the railroad company in whole, upon consideration of a certain payment, cannot be changed by the state so as to continue the obligation in full, and at the same time deny to the company, either in whole or in part, the exemption conferred by the contract."

The argument of counsel for defendant that the purpose and object of this amendment to the constitution was to prevent any decrease in the rate or any change in the method without the consent of the people is not sound. Nor is there anything in the opinion in State v. Luther, 56 Minn. 156, 57 N. W. 464, to sustain that view. On the contrary, the court by the supplemental opinion refrained from expressing any opinion upon the question whether the power of amendment remained in the state. If our views upon this branch of the case are sound, and of their correctness we are firmly convinced, it follows that the statute increasing the earnings tax to four per cent. is valid as to all lines owned and operated by defendant, whether authorized or contemplated by the old Minnesota & Pacific charter, or by subsequent legislation. We so hold.

5. But it is urged that the conclusions here announced are in conflict with prior adjudications of this court, upon which reliance is had to sustain the claim that an irrevocable contract for a three per cent. rate was created by the Minnesota & Pacific charter which passed to and became vested in defendant. Attention is called in support of this contention to First Division St. P. & P. R. Co. v. Parcher, 14 Minn. 224 (297); State v. Northern Pac. R. Co., 32 Minn. 294, 20 N. W. 234; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467, 31 N. W. 942; County of Traverse v. St. Paul, M. & M. Ry. Co., 73 Minn. 417, 76 N. W. 217; State v. Luther, 56 Minn. 156, 57 N. W. 464; Chicago, M. & St. P. Ry. Co. v. Pfaender, 23 Minn. 217; State v. St. Paul, M. & M. Ry. Co., 30 Minn. 311, 15 N. W. 307; County of Todd v. St. Paul, M. & M. Ry. Co., 38 Minn. 163, 36 N. W. 109; and other similar cases. But an examination of each demonstrates that the ques-

tion here presented was in no way involved.   The Parcher case involved the right of the state to tax the land grant in addition to enforcing the earnings tax, and, while the court discussed at some length the contractual relations arising from the Minnesota & Pacific charter, it finally reached the pivotal question before it and held that the specific exemption of the land was valid, and upon that conclusion based its decision.   The result of that decision is in full harmony with the view that the exemption of specific property donated to the railroad company for a specific purpose attached to the land, and was not, like the earnings system, a personal privilege to the grantee.

The Pfaender case involved solely the question whether the railroad was liable for a two or a three per cent. tax on its earnings.

The case of State v. Winona & St. P. R. Co., 21 Minn. 315, again presented the taxability of the land grant, and the decision was placed squarely upon the clause of the charter of May 22, 1857, which is therein quoted, that the lands granted by the state "shall be and are exempted from all taxation until the same shall have been sold and conveyed." Laws 1857, Ex. Sess., p. 17, c. 1, subc. 2, § 4.   The other cases also involved solely this specific exemption.   The question whether the provisions of the charter respecting the gross earnings tax constituted an irrevocable contract was not before the court in either of the older cases, and a consideration thereof was wholly unnecessary to the result reached.   Such appears to have been the view of Mr. Justice White (with whom concurred Justices Harlan, Gray, and McKenna), in Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162, for he there said: "Nor does it seem to me that the decisions of the Minnesota courts, which are referred to as showing that under the constitution of that state, it was competent for the legislature to enact a gross receipt tax law and provide for its continuance by an irrepealable contract, sustain the proposition deduced from them.   In no single one of these cases was the question of irrepealable contract presented, considered or decided in any form."

What was said in the opinion in State v. Winona & St. P. R. Co., 21 Minn. 315, in reference to the case of Trask v. Maguire, supra, should be given no greater force or effect than the decision of a question now claimed to have been determined but which was not before the court.   The taxation of the land grant was also involved in County of

Nobles v. Sioux City & St. P. R. Co., 26 Minn. 294, 3 N. W. 701; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467, 31 N. W. 942; County of Todd v. St. Paul, M. & M. Ry. Co., 38 Minn. 163, 36 N. W. 109; and in County of Traverse v. St. Paul, M. & M. Ry. Co., 73 Minn. 417, 76 N. W. 217. In the last case cited the court again took occasion to say [page 426] and correctly so, that "the question whether the legislation on the subject involves the elements of a contract between the defendant or its predecessor and the state is not necessarily involved, and need not now be considered." Yet that case, and the Luther case, where substantially the same statement was made, were for all practical purposes identical with the other cases referred to where the question received elaborate attention. State v. St. Paul, M. & M. Ry. Co., 30 Minn. 311, 15 N. W. 307, and State v. Northern Pac. R. Co., 32 Minn. 294, 20 N. W. 234, involved only the construction of the phrase "gross earnings," and what earnings came within its meaning. Prior to the statute construed in State v. Stearns, supra, no attempt had been made by the legislature to amend or modify this system of taxation, and the act involved in the case at bar was the first attempt to increase the rate. In that case, as already pointed out, there was a legislative attempt, based on the constitutional amendment of 1871, separately to tax the lands of the company, in addition to the gross earnings tax. This the supreme court of the United States held unreasonable.

In view of this situation, it cannot be urged with any force that the earlier decisions of the court rightly adjudicated or determined the question of the power of the state to change the rate. The question not being involved in the prior cases, former expressions of the court were obiter and of no binding force or effect as final adjudications. What was said therein is confessedly at variance with the conclusions of nearly all other courts, state and federal, and, inasmuch as the precise question was not necessarily there before the court, we are fully justified in declining to treat them as final.

Much has been written and said on the subject of the rule of stare decisis, and of the importance, in the interests of certainty in the law, of following and applying previous decisions in cases involving the same facts. The rule which requires this is a wholesome one, and we would not minimize it in the least in the present case. It has its limi-

tations, however, and applies only in those cases where the facts and issues presented are for practical purposes the same. It does not apply to expressions of opinion upon, or even decisions of, questions not necessary to the ascertainment of the rights of the parties in the pending litigation. When the court goes beyond the precise issues and expresses views or opinions upon questions not necessarily before it, the views so expressed will be respected, but cannot arbitrarily control a subsequent case where the very point is squarely presented. The reason is obvious. A question actually before the court is investigated in all its phases with deliberation and care, and, though other questions may be discussed and apt principles of law declared by way of illustration, their possible bearing on future cases is seldom fully considered. 26 Am. & Eng. Enc. (2d Ed.) 169, and cases cited; Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 257. And, in the case at bar, the validity of the land grant exemption was alone presented in nearly all the previous cases upon which defendant relies. While the court there considered and discussed the gross earnings provisions of the charter, a situation like that now before us was not investigated, considered, or attempted to be determined.

The language of Chancellor Kent (page 477 of his commentaries) is appropriate and apt in connection with this feature of the case: "But I wish not to be understood to press too strongly the doctrine of stare decisis, when I recollect that there are more than one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application. It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by a change of it."

The supreme court of Mississippi in Adams v. Yazoo, 77 Miss. 194, 288, 24 South. 200, 317, 28 South. 956, 60 L. R. A. 33, a case involv-

ing a situation quite analogous to the case at bar and where the court was confronted with prior decisions in conflict with the conclusion reached in the case then before it, said: "We have all proper respect for the doctrine of stare decisis, but it is a doctrine not inflexible and departed from over and over by the wisest courts in proper cases; and if the doctrine of stare decisis can be disregarded in proper cases, where the question is one merely of property rights between individuals, how much stronger is the reason for disregarding it when so to do results, as here, in merely restoring to a sovereign state the right to tax corporations and make them bear their just share of the burdens of that government whose protection they so constantly and persistently invoke."

See, also, 26 Am. & Eng. Enc. (2d Ed.) 183; Boyd v. Alabama, 94 U. S. 645, 24 L. Ed. 302; Cromwell v. County of Sac., 94 U. S. 351, 24 L. Ed. 195; Bradshaw v. Duluth Imperial Mill Co., 52 Minn. 59, 53 N. W. 1066; High v. Shoemaker, 22 Cal. 363; Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 257.

Our conclusions, therefore, are that defendant has no irrepealable contract on the subject of its taxation, that the statute increasing the rate of the gross earnings tax to four per cent., thus making a uniform rate as to all railroads of the state, impairs none of its contractual or other vested rights, that it is valid, and the state is entitled to judgment accordingly. The judgment of the trial court is therefore reversed on the state's appeal, affirmed as to defendant's appeal, and final judgment ordered to be entered in this court in favor of the state for the amount claimed in the complaint.

On January 12, 1909, the following opinion was filed:

PER CURIAM.

Application by the state, by order to show cause, for an order directing the clerk to include in the judgment heretofore ordered entered herein the penalty of five per cent. provided for by section 1009, R. L. 1905, for the nonpayment of the tax sought to be recovered by the action. After hearing counsel it is ordered that the application be, and it is, hereby denied.

The penalty was not claimed in the complaint, the cause has been finally disposed of, and to permit an amendment of the complaint at

this time would raise new issues, principally whether the state's right to the penalty is not barred by the statute of limitations, and a removal of the case to the court below for the trial of that issue. This the facts presented do not justify.

Order to show cause discharged.